IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

T.R.,

  Plaintiff,

v.             Civ. No. 20-276 GBW/JHR

PATRICK HOWARD, *et al.*,

  Defendants.

## <u>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS LCPS'S AND DANA CRITCHLOW'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM</u>

  THIS MATTER comes before the Court on Defendants LCPS and Dana Critchlow's[1] Motion for Summary Judgment and Supporting Memorandum.  *Doc. 153.* Having reviewed the Motion and its attendant briefing (*docs. 199, 211*), and being otherwise fully advised, the Court will GRANT the Motion IN PART and DENY the Moton IN PART.

### I. BACKGROUND

  Plaintiff T.R. attended Las Cruces High School in Las Cruces, New Mexico, graduating in 2019.  *See doc. 94* ¶ 86; Defendant's Statement of Undisputed Relevant Material Facts ("DUMF") 1.  Defendant Las Cruces Public Schools ("LCPS"), which is a state municipal corporation within the state of New Mexico and a recipient of federal

---

[1] Defendant Critchlow has since been dismissed from this lawsuit.  *See doc. 191.*

funding, operates the public school system in Las Cruces, New Mexico, including Las Cruces High School.  Plaintiff's Statement of Additional Material Facts ("PUMF") A; *doc. 211* at 7.  Plaintiff initiated this case on March 27, 2020, *see doc. 1*, and filed the operative First Amended Complaint for Damages for Violations of Civil Rights and State Torts on January 28, 2022, *see doc. 94*, bringing claims for sexual abuse perpetrated on her during the 2016-2017 and 2017-2018 school years by Defendant Patrick Howard, an agriculture teacher and Future Farmers of America (FFA) faculty advisor at LCHS. Relevant to this Motion, Plaintiff brings claims against Defendant LCPS for sexual discrimination in violation of Title IX, First Amendment retaliation, violation of her right to equal protection pursuant to the Fourteenth Amendment, and state claims under the New Mexico Tort Claims Act for negligent operation of a building and intentional infliction of emotional distress.

Defendants LCPS and Dana Critchlow filed their Motion for Summary Judgment and Supporting Memorandum on December 1, 2022, requesting the Court to enter summary judgment in their favor on all Plaintiff's claims against them. *Doc. 153* at 1-2. Plaintiff filed her Response in Opposition to Defendants LCPS'[s] and Dana Critchlow's Motion for Summary Judgment on April 3, 2023. *Doc. 199*.  The Motion was fully briefed on June 20, 2023, *see doc. 212*, with the filing of Defendant LCPS's reply, *see doc. 211*.

2

## II.   UNDISPUTED MATERIAL FACTS

The Court finds the following material facts to be undisputed for purposes of the

Motion:

1. During the 2016-2017 and 2017-2018 school years, Defendant Howard touched Plaintiff's hair, shoulders, low back, upper thigh, and buttocks, and he gave Plaintiff several full frontal hugs. *See doc. 217* at 4-6. In 2021, Defendant Howard pled guilty to Criminal Sexual Contact of a Minor in the Third Degree. *Id.* at 7.

2. At 9:30 a.m. on January 19, 2018, Las Cruces High School ("LCHS") Principal Jed Hendee received an email from Kathleen Gardner, an LCPS employee and the mother of a LCHS student, informing him that she had heard students report that Defendant Howard had "spanked [a student] on the butt" in front of other students and that he had a group text message with several female FFA students in which he invited them to his house. DUMF 20; *doc. 199* at 5, 45; *doc. 211* at 22.

3. On the afternoon of January 19, 2018, Defendant LCPS placed Defendant Howard on administrative leave, began an internal investigation into the incident, and reported the incident to the New Mexico Children, Youth, and Families Department and the New Mexico Public Education Department. DUMF 21-22, 24; *doc. 199* at 6.[2]

4. Also on January 19, 2018, Plaintiff was "pulled out of class . . . via loudspeaker, interrogated about Howard's sexual harassment and physical abuse, and then sent back to class without inquiry whether she was ready or able to return to class." PUMF VV; *doc. 211* at 12. Plaintiff testified that being called out of class by name made her feel like she was a "criminal" and like she had done something wrong. PUMF WW; *doc. 211* at 12; *doc. 199-1* at 76, 214:17-215:01.

5. After Defendant Howard was arrested, Plaintiff and other victims were indirectly referred to as "bitches" by certain students at LCHS. Plaintiff was also directly called a "bitch" on at least one occasion. Plaintiff testified that she was called derogatory names during the Spring semester of her junior year and her

---

[2] Plaintiff's citation to Defendant Howard's Online Educator Licensure Detail showing that his license had a "start date" of July 1, 2012, and an "expire date" of June 30, 2021, in no way controverts Defendant LCPS's contention that "LCPS reported the incident to CYFD and PED regarding licensure." *See* DUMF 22; *doc. 199* at 6. Additionally, Plaintiff's contention that the investigation which started on January 19, 2018 "was not in compliance with Title IX regulations" in no way controverts the start date of the investigation. *Id.*

entire senior year at LCHS.  PUMF XX (citing *doc. 199-1 at 118:12-119:18*); *doc. 211 at 12*.

6. Plaintiff testified that another female student at LCHS, C.H., told Plaintiff that after Defendant Howard was arrested, students removed a photo of Plaintiff that Howard had kept in his desk drawer and put it on the board in his classroom and wrote "nasty" things on the board, such as that Plaintiff "was just doing it for attention" and "was a slut."  PUMF XX (citing *doc. 199-1 at 68, 119:20-120:04*); *doc. 211 at 12*.

7. In addition, students would write "Free Howard" on whiteboards, doors, walls, and staircases at LCHS.  *Doc. 199-1 at 67, 116:11-18; doc. 211 at 12; doc. 211-3 at 139:14-23*.  Plaintiff testified that she saw at least 25 "Free Howard" signs posted at school after Howard's arrest and that the signs were "all over the place, and I kind of had to shut it out to get through the day."  *Doc. 199-1 at 67, 116:11-18; doc. 199-1 at 72, 174:24-175:24*.  Students also wrote "Free Howard" on sidewalks on school grounds, which stayed for "weeks on end" until it was washed off by rain.[3]  *Doc. 199-1 at 163, 66:03-11; doc. 199-1 at 153, 106:19-21; doc. 211 at 13*.  C.H. testified that Petitions to "Free Howard" or "get Howard back to teaching" were posted in classrooms and not taken down.  *Doc. 199-1 at 163, 66:05-08*.

8. After LCPS's investigation into Patrick Howard started, LCPS created a "safety plan" which included a "pressure pass."  The pressure pass permitted Plaintiff to leave class without explanation if she was having anxiety or otherwise needed to "get out of class for a few moments."  Defendant LCPS provided this pass to Plaintiff upon the request of Plaintiff's mother.  *Doc. 153-1 at 35, 22:20-23:03; id. at 49, 176:01-19*.

9. Plaintiff's "safety plan" also designated teacher Pamela Cort as Plaintiff's "safety person," which meant that Ms. Cort was available to talk to Plaintiff if Plaintiff needed support and that Plaintiff could use Ms. Cort's office as a "safe space" if she wanted to "be away from other people" at LCHS.  *Doc. 153-1 at 89, 46:16-47:09*.

10. Prior to Defendant Howard's arrest, Plaintiff was a judge and a leader in LCHS's FFA program, of which she had been a member since her sophomore year.  During her sophomore year, Plaintiff was on the FFA

---

[3] Defendant argues that the reason that the chalkings lasted for weeks was because students would rewrite over the old chalkings.  *Doc. 211 at 13 (citing doc. 211-6 at 66:9-11)*.  While this may be true, it does not controvert the fact that the chalkings were visible for weeks.

Wildlife CDE judging team that placed first in the state.  PUMF DDD; *doc. 211* at 7.

11. Plaintiff testified that although she had planned to participate in FFA during her senior year, she withdrew from FFA after Defendant Howard's arrest in early 2018, during her junior year. PUMF DDD; *doc. 211* at 7.

12. Plaintiff testified that a reason she stopped participating in FFA was the bullying she endured from other LCHS students after Defendant Howard was suspended from teaching.  PUMF EEE (citing *doc. 199-1* at 51, 52:01-09); *doc. 211* at 13-14.

13. Because of the bullying that was occurring in FFA, school administrators reviewed the code of conduct with FFA members and Assistant Principal Grubbs attended one FFA meeting and rode on bus to one judging trip "to help make sure there weren't any bullying or threats of bullying going on."  *Doc. 199* at 9; *doc. 153-1* at 86-87, 28:17-29:04.  Teacher Jessica Gute also "addressed" the "Free Howard" posters with students in her classroom.  *Doc. 199* at 9.

14. Defendant LCPS's ACA Policy titled "Sexual Harassment," contains an excerpt which reads:

    It is the responsibility of every supervisor and principal to recognize acts of sexual harassment and take necessary action to ensure that such instances are addressed swiftly, fairly, and effectively. Consequently, all LCPS administrators, teachers, and staff in schools, offices, and other facilities shall be cognizant of, and responsible for, effectively implementing the sexual harassment complaint resolution procedures established in this policy.

    *Doc. 153-1* at 116.

15. Defendant LCPS's JICK Policy on Sexual Harassment of Students contains an excerpt which reads:

    School officials, employees and volunteers shall not permit or tolerate sexual harassment of students and shall immediately report, intervene or stop sexual harassment of students that is threatened, found or reasonably known or suspected to be occurring.

    *Doc. 153-1* at 98.  This language is included under a section titled: "Standards of Conduct" and a subheading titled "Duty under the Policy." *Id.*

5

16. Vice Principal Dana Critchlow did not have the authority to hire, fire, or suspend teachers.  DUMF 73; *doc. 199* at 11 (disputing DUMF 73 but failing to specifically controvert that the LCHS Vice Principal did not have authority to hire, fire, or suspend teachers, *see* D.N.M.LR-Civ. 56.1(b)).

### III.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.  "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted).

In applying this standard, the Court must draw all "reasonable inferences" in the light most favorable to the non-moving party.  *Penry v. Fed. Home Loan Bank*, 155 F.3d

6

1257, 1261 (10th Cir. 1998). Summary judgment is appropriate only "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). All material facts set forth in the motion and response which are not specifically controverted are deemed undisputed. D.N.M.LR-Civ. 56.1(b).

**IV.   ANALYSIS**

Defendant LCPS moves for summary judgment on all of Plaintiff's claims against it, which are: (1) a Title IX claim based on theories of teacher-student harassment, retaliation, and peer-on-peer retaliation; (2) First Amendment retaliation; (3) a *Monell* equal protection claim based on an alleged school district custom or policy of failing to investigate student complaints of sexual misconduct and failing to provide sufficient training to school staff on sexual grooming, Title IX, and educator sexual misconduct; and (4) two state law tort claims for negligent operation of a building and intentional infliction of emotional distress. *See generally docs. 94, 153.* The Court addresses each in turn.

### A.  Title IX Claims

Title IX provides, in relevant part, "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving financial assistance. . ."  20 U.S.C. § 1681(a).  The provisions of Title IX are enforceable through an implied private right of action which encompasses actions for damages against a school district. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 65, 76 (1992).  Here, it is undisputed that Defendant LCPS is subject to the requirements of Title IX based on its receipt of federal funding.

Plaintiff's Title IX claim against Defendant LCPS is based on three theories of liability.  They include: (1) Defendant LCPS was deliberately indifferent to Defendant Howard's sexual harassment and sexual abuse of Plaintiff and other female students; (2) Defendant LCPS retaliated against Plaintiff for reporting sex discrimination, and (3) Defendant LCPS was deliberately indifferent to peer-on-peer retaliation directed at Plaintiff.

### i.  *Teacher-Student Harassment*

Title IX provides a cause of action for a teacher's sexual harassment of a student. *Franklin*, 503 U.S. at 75.  To prevail on a claim against a school district under Title IX, a plaintiff must establish that the district (1) had actual knowledge of, and (2) was

8

deliberately indifferent to (3) harassment that was so severe, pervasive, and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school.  *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1246 (10th Cir. 1999); *see also Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1283 (10th Cir. 2017). Because a recipient of federal funds may only be liable for damages under Title IX for its own misconduct, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999), a school district must have had "actual knowledge" of misconduct and failed to respond adequately, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285, 290 (1998).  This standard precludes liability on theories of *respondeat superior* or constructive notice.  *Id.* To show that a school district had actual knowledge of misconduct, plaintiffs must demonstrate that an "appropriate person" received actual notice of misconduct.  *Id.* at 290; *Ross*, 859 F.3d at 1283 (finding that a school district defendant can obtain notice only through an appropriate person).

At a minimum, an "appropriate person" is someone who has authority to take corrective measures on the school district's behalf to end the discrimination.  *Gebser*, 524 U.S. at 290.  The question of whether an individual is an "appropriate person" is fact-specific; a court must look beyond job titles to evaluate whether an individual possesses the requisite authority to be an "appropriate person."  *See Murrell*, 186 F.3d at 1247.  The Tenth Circuit has described an "appropriate person" as a person who "exercised control

over the harasser and the context in which the harassment occurred," or, in other words, had "the authority to halt" the harassing behavior.  *Id.* at 1247-48.

With respect to the requirement that an appropriate person have "actual notice," an individual acquires actual notice by witnessing an incident or receiving a report of an incident.  Actual notice of harassment does not occur if the individual hears about or witnesses conduct that is inappropriate but dissimilar to the harassment.  For example, in *Gebser*, the court found that reports that a teacher made inappropriate comments during class were insufficient to give notice to school officials that the teacher was involved in a sexual relationship with a student.  524 U.S. at 291; *see also Ross*, 859 F.3d at 1284.  In other words, an individual's knowledge that misconduct might be occurring and could be uncovered by further investigation is not sufficient for actual notice.

Finally, assuming a school district had actual knowledge of harassment, the school district can only be held liable if its response to the harassment was inadequate.  An inadequate response is one that amounts to deliberate indifference to the discrimination, *see Gebser*, 524 U.S. at 290, meaning that it was clearly unreasonable in light of the circumstances known at the time, *see Ross*, 859 F.3d at 1283.

Here, Defendant LCPS argues that only the Superintendent of LCPS was an 'appropriate person' for purposes of the inquiry into when LCPS obtained actual knowledge of Defendant Howard's sexual harassment of Plaintiff; that LCPS did not

receive actual notice of Defendant Howard's misconduct until January 19, 2018; and that LCPS's response was not deliberately indifferent. *See doc. 153* at 19-28. In response, Plaintiff argues that three individuals at LCHS were "appropriate persons" for purposes of the inquiry into whether Defendant LCPS had actual knowledge of Defendant Howard's sexual harassment of Plaintiff during the 2016-2017 and 2017-2018 school years or earlier, and that these individuals responded with deliberate indifference: Jessica Gute, a teacher and FFA advisor at LCHS; Dana Critchlow, the Assistant Principal at LCHS; and Jed Hendee, the LCHS principal. *See doc. 199* at 37, 47-52.

The Court begins with Principal Hendee. The Court need not decide whether Principal Hendee was an appropriate person whose knowledge about Defendant Howard's misconduct could be imputed to Defendant LCPS, because regardless of whether Principal Hendee was an appropriate person, no reasonable factfinder could find that Defendant LCPS acted with deliberate indifference following the notice received by Principal Hendee. It is undisputed that Hendee received actual notice of Defendant Howard's sexual misconduct via email at 9:30 a.m. on the morning of January 19, 2018—the same day Defendant LCPS admits it obtained actual notice of the misconduct through its Superintendent. UMFs 2-3. It is further undisputed that on the afternoon of January 19, 2018, Defendant LCPS placed Defendant Howard on

administrative leave, began an internal investigation into the incident, and reported the incident to the New Mexico Children, Youth, and Families Department and the New Mexico Public Education Department.  UMF 3.

Plaintiff argues that Defendant LCPS's response was deliberately indifferent because Defendant Howard was allowed to teach for the remainder of the school day on January 19, 2018, after Principal Hendee received Ms. Gardner's email at 9:30 a.m. *See doc. 199* at 52.  However, the "deliberate indifference" standard is only demonstrated by inaction that is "clearly unreasonable in light of the known circumstances," *Ross*, 859 F.3d at 1283, akin to "an official decision by the recipient [of federal funds] not to remedy the violation," *Gebser*, 524 U.S. at 290.  Given the timing of Defendant LCPS's response, no reasonable factfinder could find that Defendant LCPS's failure to place Defendant Howard on administrative leave earlier in the day on January 19, 2018, constituted an official decision to not remedy the sex discrimination or otherwise was clearly unreasonable in view of the circumstances at the time. Accordingly, Plaintiff has not established that Defendant LCPS was deliberately indifferent based on any notice received by Principal Hendee.

The Court turns to the two individuals whom Plaintiff argues received actual notice of Defendant Howard's sexual misconduct before Principal Hendee: teacher Jessica Gute and Assistant Principal Dana Critchlow.  *See doc. 199* at 42, 44.  The parties

dispute the degree to which Jessica Gute had knowledge of Defendant Howard's misconduct, although she stated during deposition that she felt uncomfortable with some of Defendant Howard's actions around female students during the relevant time period. *Doc. 199-1* at 99, 116:4-9. Vice Principal Dana Critchlow also indicated during deposition that she heard from another staff member that Defendant Howard had commented to students about liking to see young girls in braids. *Doc. 153-1* at 23, 79:20-24. Regardless of Gute's or Critchlow's knowledge, Defendant LCPS argues that neither of these individuals are appropriate persons because they did not possess the authority to take corrective measures on the school district's behalf with respect to Defendant Howard's misconduct—namely, by firing, suspending, or transferring him. *See doc. 153* at 20; *doc. 211* at 20. In response, Plaintiff argues that Gute and Critchlow were appropriate persons because they were "cloak[ed] with authority to 'report, intervene or stop' sexual harassment of students" by Defendant LCPS's ACA Policy on sexual harassment and JICK Policy on sexual harassment. *Doc. 199* at 38-39.

Defendant LCPS's ACA Policy titled "Sexual Harassment" reads, in relevant part:

> It is the responsibility of every supervisor and principal to recognize acts of sexual harassment and take necessary action to ensure that such instances are addressed swiftly, fairly, and effectively. Consequently, all LCPS administrators, teachers, and staff in schools, offices, and other facilities shall be cognizant of, and responsible for, effectively

implementing the sexual harassment complaint resolution procedures established in this policy.

UMF 14.  In relevant part, Defendant LCPS's JICK Policy on Sexual Harassment of Students reads:

> School officials, employees and volunteers shall not permit or tolerate sexual harassment of students and shall immediately report, intervene or stop sexual harassment of students that is threatened, found or reasonably known or suspected to be occurring.

UMF 15.  This language is included under a section titled: "Standards of Conduct" and a subheading titled "Duty under the Policy." *Id.*

Plaintiff's argument that these policies render the individuals who are subject to them "appropriate persons" is unpersuasive.  In *Ross*, the Tenth Circuit expressly rejected Plaintiff's argument that a school policy-driven duty to report sexual harassment constitutes authority to take corrective action.  859 F.3d at 1289-90.  In this case, the Tenth Circuit considered the plaintiff's argument that a university policy requiring campus security officers to automatically report sexual assaults to university administration established that campus security officers were "appropriate persons." *Id.*  The *Ross* court explained that it did not read *Gebser* to "hold[] that anyone who participates in the initiation of a corrective process is an 'appropriate person,'" because such a holding would "turn the deliberate-indifference standard into vicarious liability" for funding

recipients.  *See id*.  Explaining that *Gebser* "rejected the use of agency principles to impute liability to the district for the misconduct of its teachers," the *Ross* court held that actions that merely initiate the corrective action process—such as passing along reports to someone authorized to take corrective action—are not themselves corrective action.  *Id.* at 1290.

Under *Ross* and *Gebser*, the ACA and JICK sexual harassment policies clearly fail to confer authority to take corrective action.  The ACA policy's provision that "all LCPS administrators, teachers, and staff . . . shall be cognizant of, and responsible for, effectively implementing the sexual harassment complaint resolution procedures established in this policy" describes precisely the type of ministerial action related to the corrective action process that the *Ross* court held is not itself corrective action.  *See Ross*, 859 F.3d at 1290.

As for the JICK sexual harassment policy, its direction that individuals "immediately . . . stop" sexual harassment ostensibly requires action that would ordinarily be thought of as "corrective."  However, as the Supreme Court held in *Gebser*, appropriate persons must be individuals authorized to remedy discrimination *on behalf of the school district*.  524 U.S. at 290.  The JICK sexual harassment policy merely establishes that the individuals subject to its requirements have a "duty" to take action when there is reasonably suspected or

15

known sexual harassment.  It does not bestow authority to take official corrective

action on behalf of LCPS and therefore cannot confer the authority to take

corrective measures requisite for an "appropriate person."  Indeed, to interpret

the policy otherwise would amount to embracing near-vicarious liability for

LCPS, given the JICK policy's broad application to "school officials, employees,

and volunteers" and to situations in which "sexual harassment of students . . . is

threatened, found or reasonably known or suspected to be occurring."  UMF 15.

Accordingly, the Court rejects the "responsibility" and "duty" conferred by the

ACA and JICK sexual harassment policies as a basis for finding Assistant

Principal Critchlow and Ms. Gute "appropriate persons."

Aside from LCPS's JICK policy and ACA policy, Plaintiff does not make

any other argument or otherwise direct the Court to any evidentiary basis for a

finding that Assistant Principal Critchlow and Ms. Gute are appropriate

persons.[4]  The Court therefore concludes that there is no triable issue as to

whether Critchlow and Gute were "appropriate persons."  Because Defendant

LCPS is entitled to judgment a matter of law that it did not respond with

---

[4] Although Plaintiff also claims that Defendant Critchlow was an appropriate person because she had supervisory authority over Defendant Howard, *doc. 199* at 45, she has not come forward with any evidence in support of this contention, *see* Fed. R. Civ. P. 56(c)(1).  The Court does not find that the JICK policy or ACA policy on sexual harassment conferred supervisory authority on Defendant Critchlow, and the Court finds it undisputed that Defendant Critchlow did not have authority to hire, fire, or suspend teachers.  *See* UMF 16.

deliberate indifference following any actual notice of sexual harassment given to

Principal Hendee on January 19, 2018, and Assistant Principal Critchlow and Ms.

Gute are not "appropriate persons," the Court concludes no reasonable factfinder

could find Defendant LCPS liable to Plaintiff based on a teacher/student

harassment theory of liability under Title IX.

ii.  *Title IX Direct Retaliation*

Retaliation for reporting sex discrimination constitutes intentional

discrimination on the basis of sex in violation of Title IX.  *Jackson v. Birmingham*

*Bd. of Educ.*, 544 U.S. 167, 173-74 (2005); *Doe v. Sch. Dist. No. 1, Denver, Colorado*,

970 F.3d 1300, 1310 (10th Cir. 2020) ("An allegation that the plaintiff was

harassed for reporting misconduct can therefore suffice to state a claim for

discrimination on the basis of sex if the misconduct reported is itself sex

discrimination.").   In the Tenth Circuit, the *McDonnell Douglas* burden shifting

framework applies to Title IX retaliation claims.  *Hiatt v. Colorado Seminary*, 858

F.3d 1307, 1315 & n.8 (10th Cir. 2017).  The *McDonnell Douglas* burden-shifting

framework provides a method of proving discrimination by circumstantial or

indirect evidence, where direct evidence is unavailable.  *Doe v. Univ. of Denver*, 1

F.4th 822, 829 (10th Cir. 2021).  Under this framework, a plaintiff bears the initial

burden of establishing a prima facie case for discrimination.  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

A prima facie case for retaliation under Title IX has four elements: (1) the plaintiff engaged in protected activity, (2) the defendant had knowledge of the protected activity, (3) materially adverse school-related action was taken against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action.  *See Kincaid v. Unified Sch. Dist. No. 500*, 645 F. Supp. 3d 1134, 1161 (D. Kan. Dec. 9, 2022).  When Plaintiff has established a prima facie case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the adverse action.  Defendant's burden at this stage is a burden of production, not persuasion.  *Burdine*, 450 U.S. at 254-55.  Upon the assertion of a legitimate, nondiscriminatory reason, the burden returns to Plaintiff to show that Defendant's proffered reason is pretextual.  *Id.* at 256.  Plaintiff's burden at this stage "merges with [her] ultimate burden of persuading the court that she has been the victim of intentional discrimination.  She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.*

18

Here, Defendant LCPS admits that Plaintiff engaged in protected activity by making a complaint about sexual harassment, and it admits that it was aware of the complaint, *see doc. 153* at 29, so the first two elements of Plaintiff's prima facie case are not in dispute.  In addition, with the exception of its argument concerning the timing of Plaintiff's interviews with school officials,[5] Defendant LCPS does not challenge whether Plaintiff has demonstrated a causal connection between Plaintiff's protected activity and its allegedly retaliatory actions. *See doc. 153* at 28-32; *doc. 211* at 26.  Defendant LCPS argues that Plaintiff fails to establish a prima facie case for Title IX retaliation based on her failure to establish the third element—*i.e.*, because she fails to establish that Defendant LCPS took action against her that could be considered "materially adverse."  *Doc. 153* at 29-32.

An action is "materially adverse" if it is "sufficiently severe or pervasive that it could well dissuade a reasonable [person] from engaging in protected activity."  *Kincaid*, 645 F.Supp.3d at 1162 (citation omitted) (applying the legal standard from *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006), to a Title IX retaliation claim).  Whether an action is materially adverse is judged

---

[5] The Court does not address Defendant LCPS's causation argument at greater length because (1) Defendant LCPS does not cite any evidence showing that the date of Plaintiff's first interview with school officials was January 18, 2018, *see doc. 153* at 30 (citing DUMF 41), and (2) for the reasons explained herein, the Court finds that the circumstances surrounding the interview do not constitute a "materially adverse" action.

19

from an objective standpoint. *Burlington*, 548 U.S. at 68-69. Therefore, it does not take account of a plaintiff's "unusual subjective feelings." *Id.* However, whether an action is materially adverse must be determined in view of the particular context in which it was taken, because "an 'act that would be immaterial in some situations is material in others.'" *Id.* at 69 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)); *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (stating in the context of a Title VII case that whether an action is materially adverse is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances"). Plaintiff bases her Title IX retaliation claim on the following actions by Defendant LCPS: (1) pulling Plaintiff out of class by loudspeaker, in front of her peers, (2) questioning her without a female present; (3) sending Plaintiff back to class when she was upset after she was questioned; and (4) failing to offer Plaintiff supportive measures, including by failing to monitor Plaintiff or otherwise ensure her safety and protection at LCHS.[6] *See doc. 199* at 52-53.

---

[6] Plaintiff also argues that Defendant LCPS's failure to address "severe and pervasive" bullying of Plaintiff in the FFA program constitutes a direct retaliatory action by Defendant LCPS. *See doc. 199* at 52-53. The Court addresses this conduct in the context of Plaintiff's peer-on-peer retaliation theory of Title IX liability, *see infra* Section IV.A.iii., as Plaintiff has not come forward with evidence that Defendant LCPS's choice to not address bullying in the FFA program constitutes direct retaliation.

The Court finds that no reasonable factfinder could conclude that these actions were sufficiently severe to dissuade a reasonable person in Plaintiff's position from reporting sex discrimination.  First, directing a high school student over a loudspeaker system to report to school administrators is not an uncommon event in a typical school setting.  Such a call can come for any number of innocuous reasons.  *Cf. Burlington*, 548 U.S. at 68 (providing that under the Title VII retaliation standard, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience").  Second, the mere absence of a female official at the interview is not sufficiently severe to dissuade a reasonable person in Plaintiff's position from reporting.  Any such person will understand that reporting will inevitably involve the uncomfortable circumstance of describing personal and sensitive events to relative strangers whether they be of the same or different gender. [7] Plaintiff's argument that these circumstances caused her to "fe[el] like she was in trouble" and "like a criminal who had done something wrong" is an insufficient basis for finding that this conduct is "materially adverse."  *Cf. Semsroth*, 555 F.3d

---

[7] Defendant LCPS asserts that Vice Principal Ann Marie Mora was present when Plaintiff was interviewed, *see doc. 153* at 31, but the evidence Defendant LCPS cites in support of this contention fails to conclusively establish that Vice Principal Mora was present every time Plaintiff was interviewed.  *See doc. 153-1* at 58 (stating that Vice Principal Mora "interviewed [Plaintiff]").

at 1184 (stating that the Title VII standard for retaliation "prescribes an objective

inquiry that does not turn on a plaintiff's personal feelings").  Third, the Court

does not find that any decision by school officials to send Plaintiff back to class

when she was upset after being interviewed was a materially adverse action.

Neither side has presented evidence that this occurred, and, importantly, there is

no evidence that Plaintiff asked to not be sent back to class.

Finally, the Court does not find that the supportive measures provided (or

not provided) to Plaintiff by Defendant LCPS constitute a materially adverse

action.  Plaintiff admits that Defendant LCPS created a "safety plan" for Plaintiff,

including a "pressure pass" that permitted Plaintiff to leave class without

explanation if she was having anxiety or otherwise needed to "get out of class for

a few moments."  UMF 8.  Plaintiff's "safety plan" also designated teacher

Pamela Cort as Plaintiff's "safety person," which meant that Ms. Cort was

available to talk to Plaintiff if Plaintiff needed support and that Plaintiff could

use Ms. Cort's office as a "safe space" if she needed to be away from other people

at LCHS.  UMF 9.  Plaintiff does not argue why these measures were so deficient

that they constituted retaliatory conduct, or what additional supportive

measures were necessary.  Rather, Plaintiff's argument appears to be that

because these safety measures were put in place after Plaintiff's mother

requested them, Defendant LCPS should be deemed to have failed to provide Plaintiff with any supportive measures. *See doc. 199* at 53-54. Plaintiff cites no authority for the proposition that the failure to initiate a supportive measure despite agreeing to one suggested by the parent can constitute a "materially adverse" action, and the Court does not find that argument persuasive.

Therefore, because no reasonable jury could find that Defendant LCPS's response to Plaintiff's protected activity was a materially adverse action in these circumstances, Plaintiff fails to make a prima facie case of direct retaliation under Title IX as a matter of law. Consequently, her Title IX retaliation claim against Defendant LCPS under this theory is subject to summary judgment.

### iii.   Peer-on-peer retaliation

To establish a Title IX claim of "student-on-student sexual harassment, the plaintiff must prove that the school '(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive, and objectively offensive' that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Doe v. Sch. Dist. No. 1*, 970 F.3d at 1308 (quoting *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999). These elements apply to claims for student-on-student sexual harassment and student-on-student retaliation for reporting sexual harassment. *Id*. at 1308-1315. Schools may only

be held liable for harassment within their disciplinary authority, which means that schools may be liable if they "retain[] substantial control over the context in which the harassment occurs." *Davis*, 526 U.S. at 646.  A school is deliberately indifferent if it possesses actual notice of harassment and its response (or lack thereof) is clearly unreasonable in light of the known circumstances.  *Doe v. Sch. Dist. No. 1*, 970 F.3d at 1313.  This standard does not require schools to "purg[e] their schools of actionable peer harassment or . . . engage in particular disciplinary action." *Douglass*, 2023 WL 34439, at *10 (quoting *Davis*, 526 U.S. at 648).

Here, Defendant LCPS argues that Plaintiff's Title IX claim based on peer-on-peer retaliation is subject to summary judgment because: (1) Plaintiff fails to establish that any peer-on-peer sexual harassment she experienced from other students at LCHS was sufficiently severe, pervasive, and objectively offensive so as to deny Plaintiff access to educational benefits or opportunities at LCHS, and (2) Defendant LCPS's response to bullying of which it had actual notice (*i.e.,* the bullying within the LCHS FFA program) was not deliberately indifferent.  *See doc. 153* at 34-39.

The Court cannot find that it is beyond dispute that the bullying Plaintiff experienced was insufficiently severe to deny her access to educational benefits and opportunities at LCHS.  Plaintiff cites her own deposition testimony and the deposition testimony of other female students who were harassed by Defendant Howard to show

that after Howard's arrest, she and the other victims were referred to as "bitches" by students at LCHS, including at least one time when Plaintiff was called a "bitch" to her face.  UMF 5.  Plaintiff testified that this name-calling and bullying continued for the spring semester of her junior year and all of her senior year.  *Id.*  Additionally, it is undisputed that after Defendant Howard's arrest, LCHS students wrote "Free Howard" on whiteboards, doors, wall, and staircases at LCHS.  UMF 7.  These messages were apparently so prevalent that Plaintiff testified she saw at least 25 "Free Howard" signs in the wake of Defendant Howard's arrest.  *Id.*  "Free Howard" was also written and re-written on sidewalks on school property with chalk and allowed to remain "for weeks on end" until it was washed off by the rain.  *Id.*  Defendant LCPS does not dispute that students also posted petitions to "Free Howard" or "get Howard back to teaching" in classrooms in LCHS, and these petitions were not taken down by school staff.  *Id.*  Finally, Plaintiff testified that C.H. (another female student at LCHS who had been subject to Defendant Howard's abuse) told her that other students had found a picture of Plaintiff that Defendant Howard kept in his desk and had posted the picture on a board in Defendant Howard's classroom that had "nasty" messages about Plaintiff written on it, such as that Plaintiff "was just doing it for attention" and "was a slut."  UMF 6.

Although some of the foregoing instances of bullying or name-calling may not rise to the level of being sufficiently severe on their own, a jury could find that the totality of the harassment and bullying, including the name-calling, the offensive messages on the board in Defendant Howard's classroom, and the numerous "Free Howard" signs, petitions, and chalkings was severe, pervasive, and objectively offensive.  Defendant LCPS cites to *Davis* to argue that "[d]amages are not available for simple acts of teasing and name-calling among students."  *Doc. 153* at 37 (citing *Davis*, 526 U.S. at 651-52).  However, the bullying experienced by T.R. appears more like a public campaign of petitions and signage designed to shame and humiliate T.R. rather than simple teasing, name-calling, or other "juvenile behavior" that occurs frequently among students.  *See Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 620 (6th Cir. 2019).  A jury could also find that at least some of the bullying was pervasive and objectively offensive because it encompassed multiple and ongoing instances of harassment, some of the signage remained visible for "weeks," and the name-calling and signage made negative and damaging implications about T.R.'s character.  UMF 7. In light of this evidence, the Court is unwilling to state as a matter of law that the bullying was not severe, pervasive, and objectively offensive, especially given that the Tenth Circuit has found that the "severity and pervasiveness evaluation is particularly

unsuited for summary judgment because it is quintessentially a question of fact." *Doe v.*

*Sch. Dist. No. 1*, 970 F.3d at 1311-12.

A reasonable factfinder could also determine that the bullying and harassment

that T.R. experienced deprived T.R. of access to educational opportunities. *See Jennings*

*v. Univ. of N. Carolina*, 482 F.3d 686, 699 (4th Cir. 2007) (explaining that under *Davis*, a

plaintiff can be said to have been deprived of access to educational opportunities or

benefits when the harassment: "(1) "results in the physical exclusion of the victim from

an educational program or activity; (2) "so undermines and detracts from the victim['s]

educational experience" as to "effectively den[y her] equal access to an institution's

resources and opportunities"; or (3) has "a concrete, negative effect on [the victim's]

ability" to participate in an educational program or activity" (quoting *Davis*, 526 U.S. at

650)).  Here, Plaintiff testified that "Free Howard" signs were "all over the place [in

LCHS], and I kind of had to shut it out to get through the day."  UMF 7.  Plaintiff also

testified that she withdrew from the FFA program at LCHS due to the bullying despite

her success in that program during her sophomore year and her plans to continue her

FFA activities her senior year.  UMFs 10-12.

Defendant argues that "there is no evidence Plaintiff was excluded from an

education program or activity" because she "continued to attend school and achieve

high grades, graduating in the top of her class" and because impacts to mental health

do not constitute a denial of education opportunities.  *Doc. 153* at 35.  Although

withdrawal from school and suffering grades are certainly indicators that a student has

been excluded from educational opportunities and benefits, they are not prerequisites.

For example, in *Davis*, the student experiencing harassment did not withdraw from

school, 526 U.S. at 634, and in *Doe v. Sch. Dist. No. 1*, the student experiencing

harassment continued to receive high grades, 970 F.3d at 1312.  In addition, a jury could

conclude that withdrawal from a school-sponsored activity, like T.R.'s withdrawal from

FFA, is sufficient to constitute denial of an education program or activity.  *C.f. Cox v. S.*

*Sanpete Sch. Dist.*, Case No. 4:18-cv-0070-DN-PK, 2019 WL 2297568, at *4 (D. Utah May

30, 2019) (finding that a student was not denied access to an education program or

activity because "the [c]omplaint does not allege [that the student] was unable to attend

school or participate in the football program); *see also Doe v. Morgan State Univ.*, 544 F.

Supp. 3d 563, 576 (D. Md. 2021) (holding that a student was denied access to an

education program or activity because she declined to compete on the soccer team and

she received one failing grade in a class after she experienced a sexual assault from a

fellow student).

     The Court turns next to determining whether Defendant LCPS had actual

knowledge of the bullying and harassment that Plaintiff experienced.  As noted above,

under Title IX, Defendant LCPS had actual knowledge of the harassment if an

individual at the school who had the authority to take corrective measures on the school district's behalf to end the discrimination (an "appropriate person") was aware of the harassment. *Gebser*, 524 U.S. at 290. The parties did not brief arguments regarding who the appropriate people were that could have taken action against the student-on-student harassment experienced by T.R. The parties briefed the issue of appropriate person in the context of T.R.'s teacher-on-student harassment claim, and Defendant LCPS argued there that only the LCPS superintendent was an appropriate person because only he could take corrective measures against Defendant Howard. However, there are likely additional school personnel, including the LCPS principal, teachers, and other staff, that could have taken corrective actions to address student bullying and harassment. Because the Court cannot determine which individuals could be considered appropriate persons, the Court also cannot determine whether those individuals (1) had notice of the bullying and (2) took reasonable action in response to their knowledge of the bullying.

If a jury found that at least one or more appropriate persons at the school had actual knowledge of the bullying, it could also reasonably find that those individuals failed to take sufficient action to correct the bullying. Defendant LCPS argues that, regardless of which school officials had actual notice of the bullying, the school took reasonable action to correct it by, for example, sending emails to students and their

parents about the bullying, attending FFA meetings and riding the school bus for FFA

trips, following up with victims of bullying, and providing a safety plan for T.R.  *Doc.*

*153* at 37-38.  Defendants do not, however, provide any undisputed evidence of action

taken by the school in direct response to the "Free Howard" signs, other bullying

postings, or chalk writing, some of which was visible for weeks.[8]  UMF 7; *see doc. 153* at

37-39.  A jury could reasonably find that school officials should have taken more action

to address the harassment that T.R. experienced, particularly given the larger pool of

individuals who could have taken corrective actions against student bullying.

Based on the foregoing reasons, the Court finds that Plaintiff has come forward

with sufficient evidence to create triable issues concerning whether Plaintiff was

subjected to peer-on-peer harassment that was sufficiently severe and pervasive to deny

her access to educational resources at LCHS, whether Defendant LCPS had actual notice

of the harassment, and whether Defendant LCPS's response was deliberately

indifferent.  Therefore, the Court finds that Defendant LCPS should be denied summary

judgment on Plaintiff's peer-on-peer retaliation theory of Title IX liability.

### B.  Section 1983 Claims

---

[8] Defendant states that "[o]ne student was even suspended or expelled for posting "Free Howard." *See doc. 153* at 37.  Plaintiffs dispute this contention and point to the deposition of an LCPS official who did not mention any suspensions or expulsions in response to the bullying that occurred after Defendant Howard's removal from teaching.  *See doc. 199* at 9.

Defendant LCPS next moves to dismiss Plaintiff's constitutional claims under the First and Fourteenth Amendments.  The Court will address each claim in turn.

### i.  First Amendment Retaliation

To prevail on her First Amendment retaliation claim against Defendant LCPS, Plaintiff must show: (1) that she was engaged in constitutionally protected activity, (2) that Defendant LCPS's actions caused her "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) that Defendant LCPS's adverse action(s) against her were substantially motivated as a response to her exercise of constitutionally protected conduct.  *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).  Defendant concedes that T.R.'s reports of sexual harassment were a constitutionally protected activity.  *Doc. 153* at 42.  Defendant argues, however, that there was no speech-chilling injury and that Defendant LCPS's actions after T.R. reported the sexual harassment were not based on any retaliatory motive.  *Id.* at 42-44.  Because the Court finds that there was no retaliatory motive, the Court will grant Defendant LCPS's Motion with respect to Plaintiff's First Amendment retaliation claim.

Plaintiff argues that Defendant LCPS took retaliatory action against T.R. because staff failed to address T.R.'s and other students' reports of Defendant Howard's sexual harassment in a timely manner and because it handled the reports of sexual harassment in a way that injured T.R.  *Doc. 199* at 60.  In particular, Plaintiff alleges that after

31

Defendant Howard was removed from teaching, Defendant LCPS "pulled [T.R.] out of class" to question her without her parents present, returned T.R. to class "in an emotional state," "repeatedly interrogated" T.R. about the incidents, failed to offer T.R. "supportive measures or protection" or "inform[] her of her rights under Title IX," and "failed to take prompt, remedial action to address the peer-on-peer retaliation against T.R. by her peers." *Id.* at 60-61.

Plaintiff fails, however, to provide any evidence that Defendant LCPS took these actions as retaliation against T.R. for her reports of sexual harassment. Plaintiff's sole argument is that it is appropriate to draw an inference of a retaliatory motive because the protected conduct was followed closely in time by the adverse actions. *Id* at 62. Although temporal proximity between the protected speech and the adverse action is a factor in determining whether the actions were retaliatory, *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007), temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive, *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014). For example, in *Williams*, which Plaintiff cites in support of her argument, the court found evidence of temporal proximity between the employer's opposition of the plaintiff's unemployment benefits claim and the plaintiff's filing of a discrimination claim against the employer, but it also found that an agent of the employer told the

plaintiff at her unemployment benefits hearing that the employer would not contest the

unemployment benefits claim if the plaintiff withdrew her discrimination claim.  497

F.3d at 1092.  The court determined that these two pieces of evidence could lead a

reasonable jury to infer that the employer's decision to oppose the plaintiff's

unemployment benefits was retaliatory.  *Id.  See also Douglass*, 2023 WL 355966, at *9

(finding that a university official retaliated against the plaintiff for reporting Title IX

violations after the official issued a notice two weeks after the plaintiff's reports that

prevented the plaintiff from speaking to members on campus even though there was no

evidence that the plaintiff was engaging in harassing behavior and the official never

interviewed the plaintiff).

By contrast, in the instant case, Plaintiff does not present evidence that

Defendant LCPS's response time to reports of Defendant Howard's misconduct or

LCPS' actions after Defendant Howard was removed were motivated by a desire to

silence T.R.  For example, there is no evidence that LCPS staff, such as Jessica Gute or

Dana Critchlow, who may have had limited knowledge of Defendant Howard's sexual

harassment of Plaintiff and did not report it, encouraged T.R. to not report her

allegations to other individuals at the school.  In addition, the actions taken by Principal

Hendee and the superintendent suggest that these individuals were trying to protect,

rather than retaliate, against Plaintiff.  Indeed, once Principal Hendee was made aware

of Defendant Howard's conduct, Defendant Howard was removed from his teaching

post within the day and Defendant LCPS took immediate steps to investigate and

address the allegations of Defendant Howard's sexual harassment.  UMF 3.  The fact

that Plaintiff experienced emotional distress as a result Defendant LCPS's investigative

actions, while unfortunate, is not sufficient to prove that Defendant LCPS was

retaliating against Plaintiff for reporting her experience.  Finally, Defendant LCPS took

actions to protect T.R., such as creating a safety plan, after Defendant Howard was

removed from the school and Plaintiff began to be bullied by her peers.  UMF 8-9.  Even

if Defendant LCPS's actions were inadequate to completely protect T.R., inadequacy

does not imply retaliation.  As a result, the Court finds that Plaintiff fails as a matter of

law to meet the third prong of the test for First Amendment retaliation, and the Court

will grant summary judgment in favor of Defendant on Plaintiff's First Amendment

retaliation claim.

## ii.  Equal Protection

Plaintiff also brings a claim for violation of her rights to equal protection under

the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 based on Defendant LCPS's

policy of "discrimination against female students," *see doc. 94* ¶¶ 256-276 (Count V), and

a "failure to train" claim based on Defendant LCPS's alleged policy of not training

school officials, teachers, and students on their responsibilities under Title IX and

otherwise to respond to educator sexual abuse, *see id.* ¶¶ 277-296 (Count VI).  As a

preliminary matter, the Court notes that failure to train is not a standalone legal claim.

Rather, it is a means of bringing a constitutional claim against a municipality pursuant

to § 1983.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Plaintiff does not specify

which constitutional right Defendant LCPS is alleged to have violated by failing to train

school officials, teachers, and students regarding sexual harassment.  *See doc. 94* ¶¶ 277-

296.  However, based on the briefing in the instant Motion, the Court will assume that

Plaintiff intends to allege failure to train as one possible basis for her equal protection

claim against Defendant LCPS under the Fourteenth Amendment.

A municipal defendant, such as Defendant LCPS, is liable for a constitutional

violation under § 1983 only if "action pursuant to official municipal policy of some

nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691

(1978).  Accordingly, "[a] plaintiff suing a municipality under section 1983 for the acts of

one of its employees must prove: (1) that a municipal employee committed a

constitutional violation, and (2) that a municipal policy or custom was the moving force

behind the constitutional deprivation."  *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151

F.3d 1313, 1316 (10th Cir. 1998).  Plaintiff has met the first element of the *Monell* claim

because in a previous Order, the Court found that there was a genuine issue of material

fact regarding whether Defendant Howard violated Plaintiff's equal protection rights.
*See doc. 217* at 21-22.

In order to meet the second element of her burden under *Monell*, Plaintiff must
"identify 'a government's policy or custom' that caused the injury." *Schneider v. City of
Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (quoting *Monell*, 436 U.S. at
694). The challenged policy or custom may take different forms. *See Cacioppo v. Town of
Vail*, 528 F. App'x 929, 931-32 (10th Cir. 2013) (unpublished). "A challenged practice
may be deemed an official policy or custom for § 1983 municipal-liability purposes if it
is a formally promulgated policy, a well-settled custom or practice, a final decision by a
municipal policymaker, or deliberately indifferent training or supervision." *Schneider*,
717 F.3d at 770. For liability to attach, the plaintiff must demonstrate a "direct causal
link between the custom or policy and the violation alleged." *Hollingsworth v. Hill*, 110
F.3d 733, 742 (10th Cir. 1997) (quoting *Jenkins v. Wood*, 81 F.3d 988, 993-94 (10th Cir.
1996)). Generally, a "single incident of unconstitutional activity is not sufficient to
impose liability" under *Monell*. *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir.
1993).

Plaintiff first alleges that Defendant LCPS is liable under *Monell* for constitutional
violations against Plaintiff because it failed to train or supervise its employees
regarding teacher-on-student sexual harassment and Title IX compliance. *Doc. 199* at

63.  For a failure to train or supervise claim, Plaintiff must show that "the need for more

or different training is so obvious, and the inadequacy so likely to result in the violation

of [Plaintiff's} rights, that the policymakers . . . can reasonably be said to have been

deliberately indifferent to the need for additional training." *Jenkins*, 81 F.3d at 994.

Deliberate indifference requires a showing that Defendant LCPS had actual or

constructive notice that failing to train or supervise its employees was "substantially

certain to result in a constitutional violation" and that it deliberately or consciously

ignored that risk. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  Generally,

notice is "established by proving the existence of a pattern of tortious conduct," but

deliberate indifference can also be established "in a narrow range of circumstances

where a violation of federal rights is a highly predictable or plainly obvious

consequence of a municipality's action or inaction."  *Waller v. City and Cnty. of Denver*,

932 F.3d 1277, 1284 (10th Cir. 2019) (citations and quotations omitted).

Plaintiff argues that because Defendant LCPS failed to train or supervise teachers

and other staff on the identification and reporting of sexual harassment and sexual

grooming, LCPS staff who witnessed Defendant Howard's inappropriate conduct

toward Plaintiff and other female students did not report the conduct which allowed it

to continue.  *Doc. 199* at 63-65.  Because Plaintiff is unable to provide evidence of a

pattern in which LCPS staff failed to make timely reports of sexual harassment or

grooming, Plaintiff relies solely on the argument that it was plainly obvious that failing to train on these issues would lead to constitutional violations. *Id.*

Although the Court acknowledges that training teachers and other school employees on the signs of sexual grooming and harassment is a good practice, the Court cannot agree that a lack of training on these topics would predictably lead to constitutional violations. The underlying alleged violation of Plaintiff's rights to equal protection is that Defendant Howard committed sexual harassment for purposes of his own sexual gratification. *Shepherd v. Robbins*, 55 F.4th 810, 817 (10th Cir. 2022) (citing *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989)) (holding that a state actor who commits sexual harassment may be found to have violated the equal protection clause). The underlying constitutional violation is *not* the alleged failure by various LCPS staff to report Defendant Howard's conduct. While reports from staff members, such as Jessica Gute or Dana Critchlow, may have shortened the timeframe between Defendant Howard's acts of sexual misconduct against Plaintiff and his removal from the school, they would not have necessarily prevented Defendant Howard's deliberate acts of sexual misconduct. As a result, it is not clear that training staff on the signs of sexual misconduct would have even affected the underlying constitutional violation, let alone that a highly predictable result of not providing the training would be Defendant Howard violating Plaintiff's constitutional rights. Indeed, it is not obvious that any

kind of training can prevent an individual from committing a deliberate criminal act. *See Barney*, 143 F.3d at 1308 (". . . [W]e are not persuaded that a plainly obvious consequence of a deficient training program would be the sexual assault of inmates.").

The authority to which Plaintiff points does not persuade the Court that Defendant LCPS's failure to train staff on identifying and reporting sexual misconduct was done with deliberate indifference.  In *City of Canton*, the Supreme Court held that the need to train jail officials on how to care for an inmate who is experiencing medical issues is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that failure to train constitutes deliberate indifference.  489 U.S. 378, 381, 390 (1989).  The unique circumstances of incarceration mean that jail officials without medical training are often required to recognize and respond to an inmate's medical needs.  Because the failure to provide adequate medical care or attention in jail can be a violation of an inmate's constitutional rights, it is highly predictable that a complete failure to train jail officials on medical protocol would result in constitutional violations.  By contrast, as explained above, training LCPS staff about recognizing sexual grooming or misconduct would not necessarily prevent another staff member, like Defendant Howard, from intentionally engaging in sexual misconduct and violating a student's constitutional rights.  Thus, it is not highly predictable that failing to train on these topics would lead to constitutional violations.  Other than *City of*

*Canton*, Plaintiff is unable to provide the Court with any cases in which a court found that the need for training was plainly obvious to the municipal entity.  Overall, Plaintiff has not shown that failing to train staff regarding grooming and sexual misconduct was so likely to result in a constitutional violation that Defendant LCPS could reasonably be said to have been deliberately indifferent to an obvious need for training.

Plaintiff next alleges that Defendant LCPS has a custom of allowing educator sexual misconduct of female students and not acting on student complaints of sexual harassment by teachers.  *Doc. 199* at 66.  To establish a municipality's liability under *Monell* based on custom, Plaintiff must prove:

(1) The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the school district's employees;
(2) Deliberate indifference to or tacit approval of such misconduct by the school district's policymaking officials (board) after notice to the officials of that particular misconduct; and
(3) That the plaintiff was injured by virtue of the unconstitutional acts pursuant to the board's custom and that the custom was the moving force behind the unconstitutional acts.

*Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041.  As in failure to train claims, the deliberate indifference standard for proving a municipal custom is "stringent," *Connick v. Thompson*, 563 U.S. 51, 61 (2011), and requires proof that the municipal actor had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and it consciously or deliberately cho[se] to disregard the risk of harm."  *Barney*, 143 F.3d at 1307.

Plaintiff argues that there was a continuing, persistent, and widespread practice of LCPS educators engaging in sexual contact with female students based on evidence that several other LCPS educators have been criminally charged with sexual contact of students and evidence that Defendant Howard engaged in repeated sexual harassment of various female students, including Plaintiff. *Doc. 199* at 66. Plaintiff further argues that Defendant LCPS was deliberately indifferent to this widespread practice because: (1) "[n]umerous LCPS school officials and employees, including [Principal] Hendee, [Assistant Principal] Critchlow, [staff member] Gute, and [LCPS employee] Gardner failed to act in response to reports of Howard's educator sexual misconduct"; (2) LCPS was not in compliance with Title IX requirements because it did not appoint a Title IX Compliance Officer; (3) LCPS "failed to implement its written policies and Title IX requirements designed to protect student victims"; (4) Defendant Howard "was never disciplined," he was placed on administrative leave with pay, and his teaching license was never suspended or revoked; and (5) the Assistant Principal who was tasked with investigating Defendant Howard's sexual misconduct did not receive training on Title IX requirements. *See doc. 199* at 67-69.

Although Plaintiff has provided some evidence of other LCPS personnel being criminally charged with sexual misconduct, *see doc. 199-1* at 268,[9] Plaintiff has failed to establish that policymakers within LCPS were deliberately indifferent to instances of constitutional violations by their employees.  Plaintiff has provided no evidence that school policymakers, such as the superintendent or school board, knew about sexual misconduct by teachers and did nothing.  For example, the evidence provided by Plaintiff regarding previous instances of teachers charged with sexual misconduct does not reveal anything about how those instances of misconduct were or were not addressed by LCPS policymakers.  In the case of Defendant Howard, once Principal Hendee and the LCPS superintendent became aware of Howard's sexual misconduct, the school began to investigate the allegations, and Defendant Howard was removed from his teaching position by the end of the day.  UMF 2-3.  Defendant LCPS's immediate action to prevent Defendant Howard from committing any additional constitutional violations against female students once it had notice of the violations cannot be construed as conscious or deliberate disregard of the harm caused by Defendant Howard.

---

[9] The list of eleven individuals (including Defendant Howard) spans twenty years (2003-2023) across eight different schools.  *See doc. 199-1* at 268.  Only five of the crimes predated his conduct and one of those does not appear to have involved a student.  *Id.*

Plaintiff's purported examples of deliberate indifference do not persuade the

Court otherwise.  Plaintiff's first example in which other school employees knew about

and did not report Defendant Howard's conduct does not provide evidence that school

policymakers, such as the superintendent or the school board, had knowledge of the

conduct and failed to address it.  Plaintiff's second example fails because

noncompliance with Title IX requirements, while not ideal, is also not evidence that

school policymakers had knowledge of actual instances of sexual misconduct and that

they deliberately ignored those instances.  *See, e.g., Gebser*, 524 U.S. at 291-92 (finding

that the defendant school district's "alleged failure to comply with the [Title IX]

regulations . . . does not establish . . . actual notice and deliberate indifference").

Regarding Plaintiff's third example in which Plaintiff alleges that Defendant LCPS

failed to implement its written polices and Title IX requirements, it is unclear exactly

which policies and requirements to which Plaintiff is referring.  If Plaintiff is referring to

Defendant LCPS's failure to implement staff training on identifying and reporting

sexual misconduct or its failure to comply with Title IX regulations, the Court has

already addressed why these alleged inactions are not examples of deliberate

indifference.  If Plaintiff is referring to Defendant LCPS's actions during the

investigation into Defendant Howard's misconduct after he was removed from the

school, including its alleged failure to inform Plaintiff about her legal rights under Title

IX, *see doc. 199* at 69, its alleged failure to support Howard's victims after Howard's removal, *id.*, its purported failure to discipline Defendant Howard after removing him from teaching (also Plaintiff's fourth example of deliberate indifference), *id.* at 67, or its alleged failure to train the school investigator about Title IX requirements (also Plaintiff's fifth example of deliberate indifference), *id.* at 68, the Court is also unwilling to find that these are examples of deliberate indifference. As noted above, once Defendant LCPS learned of Defendant Howard's misconduct, it removed Howard from his teaching position by the end of the day which prevented him from committing any further constitutional violations against female students. UMF 3. Based on this action, Defendant LCPS cannot be said to have acted in conscious disregard of the risk posed by Howard. Although Defendant LCPS could have taken certain steps to better protect the victims in its investigation after Howard's removal, any missteps were negligence or administrative violations at most, not deliberate indifference. *See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1122, 1125 (10th Cir. 2008).

Plaintiff relies on the holding in *Aubert v. Central New Mexico Community College*, to show that municipal entities that promote a custom of failing to investigate or respond to sexual harassment complaints act with deliberate indifference toward the constitutional violations committed by their employees. *See doc. 199* at 70-71. However, the facts of that case are materially distinguishable from those of the instant case. In

*Aubert*, after the plaintiff was sexually assaulted by a tutor at the campus tutoring center, she complained to multiple supervisors at the tutoring center, an HR representative, and the dean of students, none of whom took immediate action.  No. 18-CV-0118-WJ-LF, 2019 WL 1239435, at *2-3 (D.N.M. Mar. 18, 2019).  The court found that the plaintiff had pleaded facts sufficient to survive a motion to dismiss given that there were "several institutional failures" to respond to the plaintiff's complaints of sexual assault as well as evidence of confusion regarding procedures for handling sexual harassment reports.  *Id.* at *9.  By contrast, and as explained above, there was no institutional failure in the instant case to respond to reports of Defendant Howard's misconduct because Defendant LCPS removed Howard from the school the same day it became aware of the misconduct.  Plaintiff's theory that there was an institutional custom of ignoring complaints of sexual misconduct cannot stand in the face of this evidence of Defendant LCPS's immediate action to stop Defendant Howard's constitutional violations.

In summary, Plaintiff has not shown that Defendant LCPS displayed the requisite deliberate indifference to support a *Monell* claim based on either a failure to train or custom theory.  As a result, Plaintiff's § 1983 claims against Defendant LCPS will be dismissed.

### C.  State Law Tort Claims

Lastly, Defendant LCPS moves to dismiss Plaintiff's two state law tort claims—

negligent operation of a building and intentional infliction of emotional distress.  Under

the New Mexico Tort Claims Act ("NMTCA"), governmental entities and public

employees are generally immune from tort claims unless a waiver applies.  *Cobos v.*

*Dona Ana Cnty. Hous. Auth.*, 970 P.2d 1143, 1145 (N.M. 1998); N.M. Stat. Ann. § 41-4-4.

The parties do not dispute that LCPS is a governmental entity which is generally

entitled to immunity under the NMTCA.  In addition, Plaintiff concedes that there is no

applicable waiver in the NMTCA for her intentional infliction of emotional distress

claim, *see doc. 199* at 72; *Silva v. Town of Springer*, 912 P.2d 304, 311 (N.M. Ct. App. 1996).

As a result, the only remaining question is whether there is a waiver which applies to

Plaintiff's negligent operation of a building claim.  Based on the following reasons, the

Court finds that there is not.

Section 41-4-6 of the New Mexico Tort Claims Act waives immunity for "liability

for damages resulting from bodily injury, wrongful death, or property damage caused

by the negligence of public employees while acting within the scope of their duties in

the operation or maintenance of any building, public park, machinery, equipment or

furnishings."  N.M. Stat. Ann. § 41-4-6(A).  The New Mexico Supreme Court

"interpret[s] Section 41-4-6(A) broadly to waive immunity 'where due to the alleged

negligence of public employees an injury arises from an unsafe, dangerous, or defective

condition on property owned and operated by the government." *Encinias v. Whitener Law Firm, P.A.*, 310 P.3d 611, 616-17 (N.M. 2013) (quoting *Castillo v. Cnty. of Santa Fe*, 755 P.2d 48, 50–51 (N.M. 1988)).  The dangerous condition does not have to arise from the physical aspects of a public building or its surrounding grounds.  *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1261 (N.M. 2006).  Rather, it may be the presence of dangerous actors on public property.  *Encinias*, 310 P.3d at 617–19 (violent students in a parking area near a school where students congregated); *Castillo*, 755 P.2d at 49–51 (roving dogs in a public housing complex); *Callaway v. N.M. Dep't of Corr.*, 875 P.2d 393, 399 (N.M. Ct. App. 1994) (roaming gang members in a prison's recreation area).  Nonetheless, a claim premised solely on negligent supervision does not fall within the waiver.  *Espinoza v. Town of Taos*, 905 P.2d 718, 721-22 (N.M. 1995).  However, the waiver does extend to circumstances which may be considered "negligent supervision" if the failure of supervision is "tied directly to the operation of the school building."

Indeed, Plaintiff's claim is one which falls within this broad concept of "negligent supervision."  Plaintiff contends that Defendant Howard was the "dangerous condition for females."  *Doc. 199* at 72.  She is not claiming that Defendant LCPS was negligent for hiring Defendant Howard.  Consequently, her claim is that it did not supervise him and/or its other employees sufficiently to prevent the female students from being harmed by him.  As such, the Court must analyze the somewhat unclear state caselaw

47

regarding negligent supervision claims to determine if Plaintiff's claim falls within the

Section 41-4-6(A) waiver. *See Kreutzer v. Aldo Leopold High Sch.*, 409 P.3d 930, 944 (N.M.

Ct. App. 2017); *Espinoza*, 905 P.2d at 722; *Encinias v. Whitener Law Firm, P.A.*, 310 P.3d

611, 616–17 (N.M. 2013); *Leithead v. City of Santa Fe*, 940 P.2d 459, 463–65 (N.M. Ct. App.

1997); *Prewitt v. Los Lunas Sch. Bd. of Ed.*, 2020 WL 3078505, at *4 (N.M. Ct. App. June 9,

2020) (unpublished); *see also Seal v. Carlsbad Indep. Sch. Dist.*, 860 P.2d 743, 746–47 (N.M.

1993).

     In *Espinoza* and *Kreutzer*, New Mexico Courts found that Section 41-4-6 does not

waive immunity for negligent supervision if the premises being supervised is not

reasonably known to be dangerous absent the supervision. In *Espinoza*, a child, who

was attending a town summer camp, was injured when he fell from a playground slide

when the camp employees were inattentive. 905 F.2d at 719. The New Mexico Supreme

Court held that the negligent supervision claim did not fall within the waiver because

"[t]he playground was a safe place for children[;] … [it], particularly the slide, was not a

condition requiring supervision." *Id*. at 722. In *Kreutzer*, a student was assaulted by

another student in the parking lot of the school. 409 P.3d at 931. The assaulted student

argued that her claim was not based on negligent supervision but on the school's

"failure to have an appropriate written policy for student safety in its parking lot and its

failure on the day of the incident to follow an informal policy of having the parking lot

monitored by a staff member." *Id*. at 934.  The New Mexico Court of Appeals rejected

this argument as a ground for the Section 41-4-6 waiver because plaintiff failed to

present evidence of: (1) "a dangerous condition in the school parking lot;" (2) that the

defendant school "knew or should have known that the parking lot was unsafe;" or (3)

that the school "knew or should have known that [the assailant] had a propensity for

violence or posed a threat to [the victim] (or to anyone at the school)." *Id*. at 944.  In

short, because the school had no reason to be aware of a dangerous condition in the

parking lot, either based on its intrinsic characteristics or the persons present there, the

New Mexico Court of Appeals found that plaintiff's claim was one solely based on

negligent supervision and thus barred by immunity.

   In contrast, in *Leithead* and *Prewitt*, the New Mexico Court of Appeals found

waiver for negligent supervision since the premises supervised were reasonably known

to be dangerous absent adequate supervision.  In *Leithead*, the court tackled whether a

claim based on the "negligent provision of lifeguard services at a public swimming

pool" fell within the Section 41-4-6 waiver.  940 P.2d at 460.  The parents of a six-year-

old girl who drowned in a municipal swimming pool sued the city alleging that "when

City lifeguards did not adequately perform duties that were essential to public safety,

they negligently operated the swimming pool and thereby created a condition on the

premises that was dangerous." *Id*. at 462.  The defendant city argued that this claim

was based on negligent supervision and thus barred by immunity as in *Espinoza*.  *Id*. at

461-62.  The court rejected this argument and found that the plaintiff had raised "a

claim for negligent 'operation and maintenance'" because "[a] swimming pool without

an adequate number of trained lifeguards creates a dangerous condition on the physical

premises which affects the swimming public at large."  *Id*. at 462–63.  Elaborating on its

holding, the court emphasized that "lifeguard services are so essential to the safety of a

swimming pool that they seem akin to other kinds of safety equipment, such as lifelines

and ladders, that are fundamental in making the premises reasonably safe for the

swimming public."  *Id*. at 463.  It also clarified that the applicability Section 41-4-6

waiver did not turn on the presence or absence of lifeguards, because "[t]he presence of

lifeguards in adequate numbers but who are inattentive or careless in performing their

duties makes the premises no less dangerous and gives rise to a situation from which

the jury could reasonably determine that the City negligently operated the pool."  *Id*. at

464-65.  *Leithead*, therefore, stands for the proposition that both the absence of lifeguards

and negligent supervision by lifeguards amount to "a condition on the premises that

creates a potential risk to the general public, which is the essential ingredient to liability

under the [TCA]."  *Id*. at 465 (internal quotation marks and citation omitted).

   In *Encinias*, a student was attacked by another student on an area of school

property that was known by school officials to be the site of significant student-on-

student violence. 310 P.3d at 619. Despite the school's awareness of previous violence, school officials did not place teachers in the area or install security cameras. *Id.* The court held that the "school's failure to address a pattern of student violence in a particular area" raised a genuine issue of material fact regarding whether the school had negligently permitted a dangerous condition and thus whether the Section 41-4-6(A) waiver applied. *Id.; cf. Kreutzer*, 409 P.3d at 932 (holding that there was no indication to school officials prior to a student-on-student attack that the attacking student was likely to engage in violence).

In *Prewitt*, a student was exercising using weights without a spotter in the school's weight room, and the weight slipped and crushed his finger. 2020 WL 3078505, at *1. In his subsequent lawsuit, the student "alleged that the safe operation of the weight room required that spotters be used while student athletes were operating or using various free weight equipment." *Id.* (internal brackets and ellipses omitted). The student further claimed that the school had a practice of failing to provide spotters despite its posted rules for the weight room requiring them. *Id.* The defendants argued that the student's claim was one for mere negligent supervision which did not fall within the Section 41-4-6 waiver. *Id.* To resolve this dispute, the New Mexico Court of Appeals compared *Espinoza* with *Leithead*. *Id.* at *2-*4. It found that the weight room was more akin to the swimming pool in *Leithead* than the playground in *Espinoza*

51

because the "weight room – according to [the p]laintiff's allegations and [the d]efendants' admissions[10] – could not be safely operated without spotters, and therefore, [the d]efendants' failure to provide spotters arguably created a dangerous condition affecting all student athletes using the facility." *Id.* at *4. For this reason, the court "conclude[d that the p]laintiff's allegations present more than a claim for mere negligent supervision but rather a claim for negligent failure to provide services necessary to safely operate a weight room—a claim which falls within the waiver provision of Section 41-4-6." *Id*.

Having reviewed this caselaw, the Court holds that the key question which dictates whether a negligent supervision claim falls within the Section 41-4-6(A) waiver is as follows: Is the public premise reasonably known to be dangerous in the absence of the supervision that the plaintiff claimed was lacking? In this case, therefore, Plaintiff must be able to establish that Defendant LCPS should have known that Defendant Howard was a "dangerous condition." Plaintiff cannot.

As explained above, no reasonable jury could find that the relevant authorities within Defendant LCPS had notice of the danger posed by Defendant Howard prior to January 19, 2018. Once Defendant LCPS received the report of Defendant Howard's misconduct, it took immediate action to address the danger caused by Defendant

---

[10] This admission came in the defendants' answer. *See Prewitt v. Los Lunas Schs. Bd. of Ed.*, 2020 WL 3078505, *4 (N.M. Ct. App. June 9, 2020).

Howard by interviewing students and removing Defendant Howard from his position

at the school by the end of the day.  UMF 3.  Thus, Plaintiff's claim does not fall within

the Section 41-4-6(A) waiver.

On this point, the Court must address two further points.  First, in *Upton v. Clovis*

*Mun. Sch. Dist.*, 141 P.3d 1259 (N.M. 2006), the New Mexico Supreme Court appears to

have embraced an alternative and distinct theory under which a "negligent

supervision"-type claim could fall within the Section 41-4-6(A) waiver.  *See Kreutzer*, 409

P.3d at 933-34 (finding no waiver under a more straightforward dangerous condition

theory and that the "[p]laintiffs also [could not] establish waiver under *Upton* …

because *Upton* requires multiple safety policy failures").  In *Upton*, the parents of a

student, who died from an asthma attack after a substitute physical education ("PE")

teacher did not exempt her from PE class, sued the school for negligence under a

Section 41-4-6 waiver theory.  As the *Upton* court explained:

> The [plaintiffs] claim[ed] the [Defendant] School District negligently put
> in motion a chain of events that both preceded and followed the specific
> decisions of the hapless substitute teacher.  The school failed to
> implement [the asthmatic student's individualized education plan[11]], to
> respond appropriately to the specific information it was given about [the
> student's] condition, and to implement the specific assurances given to
> the [plaintiffs] about the care the school was to provide in light of [the
> student's] special needs.  The substitute teacher, a school employee,
> forced [the student] to continue her exercise despite tangible evidence of

---

[11] An IEP is an agreement between parents of a child with special needs and educators specifying certain
educational goals and the special services that this child requires.  *Upton*, 141 P.3d at 1260.

> her distress.  Then, the school failed to properly implement its emergency
> procedures.  Faced with [the student's] acute distress, the school never
> administered CPR, no one called 911 in a timely manner, [the student]
> was simply wheeled outside to await emergency personnel.

141 P.3d at 1263–64.  On these facts, the *Upton* court concluded that the plaintiffs'

"challenge [to] the School District's general failure to implement promised safety

policies for at-risk students" "assert[ed] much more than negligent supervision of their

daughter."  *Id*. at 1263.  As the *Kreutzer* court noted, the *Upton* theory of Section 41-4-6

waiver was predicated on several facts which included: an individual with special

medical needs, an institution that had been advised of those needs and knew how to

address them, and multiple safety policy failures which led to harm.  409 P.3d at 947.

Plaintiff's claim would also not succeed under this theory of waiver because she

cannot establish multiple safety failures.  Relevant here, Plaintiff argues that because

Defendant LCPS's actions and inactions created the dangerous condition of Defendant

Howard sexually harassing and assaulting female students, the Section 41-4-6(A)

waiver of immunity applies and Defendant LCPS should be found liable for negligent

operation of a building.  In particular, Plaintiff argues that Defendant LCPS failed "to

implement and train on its written policies" regarding sexual harassment, failed "to

appoint a Title IX Compliance Officer or provide any training on teacher-on-student

sexual harassment or Title IX's requirements," and failed "to timely act on complaints

about Howard's sexual misconduct and promptly remove Howard from his teaching

and FFA advisor positions." *Doc. 199* at 74. As noted above, the Court rejects the contention that Defendant LCPS failed to timely act on complaints about Howard's sexual misconduct. Even if Defendant LCPS did not have a Title IX compliance officer or did not specifically train staff regarding teacher-on-student harassment or Title IX requirements, LCPS implemented clear policies that sexual harassment of students is improper and would not be permitted. UMF 15. There is no evidence that LCPS officials created an environment where sexual misconduct by teachers was allowed or even tolerated. Whatever deficiencies Defendant LCPS may have had, they do not remotely approach those found in *Upton*. Moreover, unlike in *Upton*, those policy deficiencies are quite attenuated from the harm visited upon Plaintiff. For example, the designation of a Title IX Compliance Officer would likely have had little impact on Defendant Howard's intentional decisions to engage in sexual harassment of female students in clear violation of both school protocol and the law. For these reasons, even assuming an independent *Upton*-theory of Section 41-4-6 waiver, Plaintiff's claim would fall outside it.

Second, having concluded that the bulk of Plaintiff's negligent operation claim falls outside the Section 41-4-6 waiver, the Court must address one discrete portion. As explained above, Plaintiff's Title IX peer-on-peer retaliation claim survives summary judgment. *See infra* at 23-30. Much of the basis for that ruling was the conclusion that

Plaintiff could establish that Defendant LCPS failed to reasonably address signs, posting, and displays which targeted the female students who reported Defendant Howard. *Id*. Failure to properly maintain the school grounds to prevent such bullying falls squarely within a typical claim of negligent operation of a building. Nonetheless, to the extent that Plaintiff's negligent operation claim includes this theory, it would still fail. Immunity is not waived under Section 41-4-6 for a condition that only endangers the eventual victim. *See Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1261 (N.M. 2006); *Archibeque v. Moya*, 866 P.2d 344, 348 (N.M. 1993). The dangerous condition must "threaten[] the general public or a class of users of the building." *Upton*, 141 P.3d at 1261 (citing *Espinoza v. Town of Taos*, 905 P.2d 718, 721 (N.M. 1995), and *Castillo*, 755 P.2d at 51). Because the bullying postings endangers only the accusers of Defendant Howard, the potential theory of liability does not fall within the Section 41-4-6 waiver.

Because Plaintiff has not shown that the Section 41-4-6(A) waiver applies to her negligence claim against Defendant LCPS and because Plaintiff has conceded that there is no waiver that applies to her intentional infliction of emotional distress claim, the Court will grant summary judgment to Defendant as to Plaintiff's state law claims.

## V.   CONCLUSION

**IT IS HEREBY ORDERED** that Defendants LCPS's and Dana Critchlow's

Motion for Summary Judgment and Supporting Memorandum (*doc. 153*) is GRANTED

IN PART and DENIED IN PART.

The following claims are DISMISSED WITH PREJUDICE:

(1) Plaintiff's claims against Defendant LCPS for violations of Title IX based on theories of teacher-student harassment and institutional retaliation (Count II).

(2) Plaintiff's claim for First Amendment Retaliation under Section 1983 (Count III);

(3) Plaintiff's claim for Violation of Plaintiff's Rights Under the Equal Protection Clause, pursuant to 42 U.S.C. Section 1983 (Count V);

(4) Plaintiff's *Monell* claim (Count VI);

(5) Plaintiff's Negligent Operation of a Building claim (Count VII);

(6) Plaintiff's claim for Intentional Infliction of Emotional Distress against Defendant LCPS (Count IX); and

Plaintiff's claim against Defendant LCPS for violations of Title IX of the Education Amendments of 1972 based on the peer-on-peer retaliation theory (Count II) remains.

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**

57