# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

T.R.,

     Plaintiff,

v.                                             Civ. No. 20-276 GBW/JHR

PATRICK HOWARD,

     Defendant.

## ORDER GRANTING IN PART DEFENDANT HOWARD'S MOTION FOR REMITTITUR OR ALTERNATIVELY NEW TRIAL

THIS MATTER comes before the Court on Defendant's Motion for Remittitur or Alternatively New Trial (Excessive Compensatory Damages and Punitive Damages), *doc. 375*, and associated briefing, *docs. 383, 392*.  Having carefully considered the evidence presented at trial and the parties' briefing for this Motion, having conducted a hearing on this Motion, *doc. 405*, and being otherwise fully advised regarding relevant case law, the Court will GRANT the Motion for Remittitur.  The Court will HOLD IN ABEYANCE Defendant's Motion for a New Trial until after Plaintiff makes her decision regarding whether she will accept the remitted compensatory award or proceed to a new trial on those damages.

# I.   BACKGROUND

## A.   Procedural Background

The Court held a jury trial in this matter between March 4 and March 11, 2024. *See docs. 395-400.* The only claim at issue during trial was Plaintiff's federal constitutional claim that Defendant Patrick Howard violated her right to equal protection when he engaged in sexual misconduct against Plaintiff while Plaintiff was a high school student. At the close of evidence, but before closing arguments, Defendant Howard conceded that he violated Plaintiff's constitutional right to equal protection. *See doc. 400* at 9:7-21; 12:10-16. As a result, the only issue that went to the jury was a determination of both compensatory and punitive damages. *See doc. 354* at 32-33 (Special Verdict Form). After deliberation, the jury assessed compensatory damages in the amount of $11 million and punitive damages in the amount of $33 million against Defendant Howard. *Doc. 367*.

On April 11, 2024, Defendant Howard filed his timely Motion for Remittitur or Alternatively New Trial in which he requests that the Court remit the compensatory damage award to $1 to $1.5 million and remit the punitive damage award to an equal or lesser amount. *Doc. 375* at 36. In the alternative, Defendant Howard requests that the Court grant a new trial. *Id.* at 28-35. Plaintiff responded on April 25, 2024. *Doc. 383*. Briefing was complete, *doc. 393*, with the filing of Defendant's reply on May 9, 2024, *doc. 392*. The Court held a hearing on the Motion on May 20, 2024. *Doc. 405*.

B.      **Summary of Evidence Presented at Trial**

This case centers around sexual misconduct that Defendant Howard inflicted

upon Plaintiff while Plaintiff was an underage high school student, and Defendant

Howard was an agricultural teacher and the leader of the Future Farmers of America

(FFA) program at Las Cruces High School.  According to the evidence presented at trial,

during the 2016-2017 and 2017-2018 school years, Defendant Howard engaged in

various instances of misconduct against Plaintiff including making inappropriate and

sexualized comments about Plaintiff's physical appearance and clothing, sending

private and group text messages to Plaintiff and other female students on non-school-

related topics, and placing a photograph of Plaintiff on his classroom desk.  Evidence at

trial also revealed that Defendant Howard sexually touched Plaintiff including by

giving her numerous, long, full frontal hugs during which he pressed her breasts

against his chest, repeatedly asking Plaintiff to sit next to him during class and then

pressing his knee against her leg, giving Plaintiff shoulder massages, braiding and

touching Plaintiff's hair, placing his hand on Plaintiff's clothed upper thigh numerous

times including while she was asleep, placing his hand on Plaintiff's clothed buttocks

when she slipped in the hallway and he was preventing her fall, and once giving her a

hug and then sliding both hands down to cup her clothed buttocks.  After Defendant

Howard was placed on leave from his teaching position and Plaintiff provided a report

of her experience to school and law enforcement authorities, Plaintiff experienced

bullying in school and on social media including when she was called derogatory names by other students and when students publicly expressed their support of Defendant Howard through physical signs and social media posts.

As a result of Defendant Howard's conduct and the ensuing bullying, Plaintiff testified at trial that she faced, and continues to face, significant emotional and mental distress. For example, she testified that she experiences Post Traumatic Stress Disorder ("PTSD"), panic attacks, anxiety, nightmares, dissociation, and irritability, and she has experienced suicidal thoughts in the past. Plaintiff has flashbacks to Defendant Howard touching her, and she has difficulty with touch and intimate relationships. She also testified that she suffers from vaginismus, a contracting of her pelvic muscles during intimate experiences. Plaintiff changed some of her behaviors because of Defendant Howard's misconduct, including not living in the dorms when she went to college and avoiding places like college football games where she might encounter Defendant Howard. In addition, Plaintiff testified that she felt alienated and silenced by her community because they did not believe her experience. She also felt degraded after Defendant Howard received five years of probation for his charge of criminal sexual contact of a minor, and he was not required to register as a sex offender.

## II.    MOTION FOR REMITTITUR

In his Motion for Remittitur, Defendant Howard requests that, pursuant to Fed. R. Civ. P. 59, the Court remit the compensatory damage award to $1 to $1.5 million and

remit the punitive damage award to an equal or lesser amount.  *Doc. 375* at 36.  For the reasons provided below, the Court agrees that both damages awards are excessive, and it will remit the compensatory damage award from $11 million to $3.25 million, and the punitive damage award from $33 million to $3.25 million.  The Court addresses each damage award in turn.

### A.      Compensatory Damage Award

In a civil trial, "the jury, who has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages, pursuant to the court's instructions, deemed proper to fairly compensate the injured party."  *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1063 (10th Cir. 2013) (quoting *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985)).  Generally, the jury's "determination of fact is considered inviolate."  *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 668 (10th Cir. 2016) (quoting *Hynes v. Energy W., Inc.*, 211 F.3d 1193, 1206 (10th Cir. 2000)).  However, remittitur of a damages award may be appropriate if "the jury award is so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial."  *Burke v. Regalado*, 935 F.3d 960, 1035 (10th Cir. 2019) (quoting *Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1021 (10th Cir. 2006)).  Indeed, "it is the duty of the trial judge to require a remittitur or a new trial if the amount of damages

awarded is excessive." *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1061 (10th Cir. 2016) (quoting *Linn v. United Plant Guard Workers*, 383 U.S. 53, 65-66 (1966)).

"To determine whether remittitur is appropriate" for compensatory damages, "courts must evaluate whether the evidence supports the verdict." *Burke*, 935 F.3d at 1035 (citation omitted). The evidence is viewed in the light most favorable to the prevailing party. *Hill*, 815 F.3d at 668 ("The amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it.") (citing *Prager*, 731 F.3d at 1063). The movant bears the "heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence." *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998) (citation and quotation omitted).

Finally, a court may only order remittitur if "the error affects the amount of damages awarded without affecting the finding of liability." *Osterhout v. Bd. of Cnty. Comm'rs of LeFlore Cnty., Okla.*, 10 F.4th 978, 996 (10th Cir. 2021). If error affected the finding of liability, the court should order a new trial. *Id.* Because Defendant Howard conceded liability for his violation of Plaintiff's equal protection rights at the close of evidence, any jury error caused by passion or prejudice could not have affected the finding of liability, and thus remittitur is the appropriate remedy if the Court finds such error.

The Court first addresses Plaintiff's contention that Defendant Howard failed to preserve his argument that the evidence does not support the jury's verdict under Fed.

6

R. Civ. P. 59 because he did not move for judgment as a matter of law ("JMOL") under Fed R. Civ. P. 50(a) after the close of evidence.  This argument does not have merit. Defendant Howard's motion was brought pursuant to Rule 59 (New Trial).   There is no requirement that a party bring a JMOL motion before they may bring a Rule 59 Motion for a New Trial.  *See* Fed. R. Civ. P. 59(a).  In addition, a Rule 59(a) Motion for a New Trial is the correct mechanism for bringing a motion for remittitur.[1]  *See Burke*, 935 F.3d at 1034.  More importantly, Defendant Howard could not have brought a JMOL motion at any point because he admitted liability on the only legal claim remaining against him before the jury was dismissed for deliberation.  Overall, Defendant Howard is not challenging the legal sufficiency of the evidence against him for the liability verdict (because there was no liability verdict).  Instead, he is challenging the sufficiency of evidence supporting the damages verdict, the correct standard for a remittitur motion. *See id.* at 1035.

The Court now turns to remittitur of the compensatory damage award.  After a careful and considered review of the evidence presented at trial, the Court finds that an $11 million compensatory damages award is "so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial."  *Id.* at 1035.  Further, the Court determines

---

[1] Defendant Howard incorrectly cites Fed. R. Civ. P. 59(e) as the basis for a remittitur.  *See doc. 375* at 1. However, Plaintiff also cites to Rule 59(e) as the basis for the remittitur motion, *see doc. 383* at 8, so the Court will ignore the parties' citation error.

that the compensatory damages award is "clearly, decidedly, [and] overwhelmingly against the weight of the evidence." *Blanke*, 152 F.3d at 1236. Although the jury heard evidence that Plaintiff's mental and emotional distress which occurred as a result of Defendant Howard's sexual misconduct was and is severe, there is not evidence to support a finding that Plaintiff's distress should be compensated with $11 million.

The $11 million compensatory award is completely out of proportion to any objective measure of Plaintiff's damages based on the evidence presented at trial. The jury heard evidence that would lead anyone to conclude that Plaintiff's mental and emotional distress, which includes panic attacks, suicidal thoughts, PTSD, nightmares, irritability, anxiety, and dissociation, is severe. However, the jury also heard evidence that Plaintiff has achieved significant success in her life by maintaining a job throughout college, graduating from college with a challenging major, and getting accepted to a highly competitive veterinarian program. Based on the compensatory damages award alone, Plaintiff would receive approximately $169,000 per year between the beginning of Defendant Howard's misconduct and the end of her life.[2] Without diminishing the

---

[2] According to 2022 data, the average life expectancy for a female in the United States is 80.2 years. *See* Center for Disease Control, *Mortality in the United States, 2022* (Mar. 2024), https://www.cdc.gov/nchs/products/databriefs/db492.htm (last visited May 31, 2024). The Court assumes Defendant Howard's misconduct began sometime when Plaintiff was 15 and that Plaintiff will live until approximately 80 years of age. The calculation is as follows:

$$\$11,000,000 \ (compensatory \ award) / \ 65 \ (years \ of \ life \ starting \ at \ age \ 15) = \$169,230.77$$

This calculation does not account for the higher present value of money.

degree to which Plaintiff's own grit and determination have helped her overcome the damage that Defendant Howard's actions inflicted upon her, the Court simply cannot reconcile a damage award of $169,000 per year for the rest of her life with the evidence of Plaintiff's symptoms as well as her behavior and personal successes after the events underlying this lawsuit.

An objective assessment of Plaintiff's treatment for her injuries is also out of proportion with the compensatory damages award.  The jury heard evidence that Plaintiff has sought treatment for her mental distress through regular therapy sessions and a short time period taking antidepressant medications, and that Plaintiff may need continuing therapy for the rest of her life.  Although mental health treatment is subjective and Plaintiff's use of therapy as her primary treatment does not necessarily imply that her mental distress was more or less severe than an individual who requires more intensive treatment, Plaintiff's treatment record is not compatible with $11 million in compensatory damages.  One measure, albeit partial and imperfect, of how much Plaintiff should be compensated for her losses is the cost of her treatment.  Assuming Plaintiff requires two therapy sessions per month from the age of 15 until the end of her life,[3] and a therapy session costs $150,[4] Plaintiff's total lifetime therapy costs would

---

[3] The testimony of Plaintiff and her counselor indicated that her therapy sessions averaged twice a month when she was regularly receiving therapy.

[4] $150 was the cost of one sixty-minute therapy session with Plaintiff's therapist in Las Cruces, New Mexico.  *See* Exhibit 84 (not admitted at trial).

equal $234,000.[5]  Using this calculation, Plaintiff's compensatory damage award is approximately 47 times the lifetime cost estimate of therapy assuming no improvement which would permit the reduction of such therapy.  The Court acknowledges that the financial cost of therapy is clearly an insufficient measure of Plaintiff's total emotional costs, and that "[t]here is no requirement that the award for mental distress bear any relationship to any financial loss incurred by Plaintiff as a result of the tortious act." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1169 (10th Cir. 1981).  However, these calculations provide at least some insight into the excessiveness of the compensatory award.

In addition, the numerical figure of the award raises a clear inference that the jury acted with passion or prejudice.  During opening and closing arguments, Plaintiff's counsel stated that an award of $9 to $11 million would properly compensate Plaintiff for her injuries.  Plaintiff's counsel did not present any kind of damages model or calculations for the jury, nor did they attempt to explain, even in the abstract, how they arrived at their valuation.  In Defendant Howard's argument, defense counsel provided a compensatory damage estimate of $250,000.  Despite the facts that Plaintiff's damage estimate was completely unmoored from any damage model and that defense counsel

---

[5] Again, the Court assumes Plaintiff will live until the age of 80. The calculation is as follows:

$$150 \, (cost \ of \ session) * 24 \, (sessions \ per \ year) * 65 \, (years \ of \ life \ starting \ at \ age \ 15) = \$234,000$$

Because this calculation of the total cost of therapy is not discounted to account for the higher present value of money, it is a significant overestimate.

suggested a significantly lower amount, the jury awarded the exact maximum amount requested by Plaintiff.[6]  This result suggests to the Court that the jury did not weigh all of the evidence, including any of the mitigating evidence related to Plaintiff's damages, in order to calculate an accurate compensatory damage sum.  Rather, they were largely guided by the arguments of Plaintiff's counsel and acted with at least some bias toward awarding Plaintiff as large a sum as possible.  *See, e.g., Jones v. City of St. Paul*, CIVIL NO. 20-707 (DSD/ECW), 2024 WL 489705, at *2 (D. Minn. Feb. 8, 2024).

Throughout the trial, there were at least three potential sources of passion or prejudice which likely led the jury to favor Plaintiff's case and award an excessive amount of compensatory damages.  First, the jury heard a significant amount of highly emotional evidence which was admitted for limited purposes.  Because Defendant Howard did not admit liability until the close of evidence, whether he touched Plaintiff for purposes of his own sexual gratification (the relevant standard for a finding of liability for a violation of Plaintiff's constitutional right to equal protection) was at issue during the trial.  Accordingly, pursuant to Fed. R. Evid. 404(b), the Court permitted several other former students to testify about Defendant Howard's sexual misconduct against them for purposes of proving Defendant Howard's intent when he touched Plaintiff.  *See doc. 262.*  In addition, because Plaintiff sought punitive damages, the Court permitted these other former students to testify about "the immediate and medium-

---

[6] Notably, the jury did the same for punitive damages.

term impact" of Defendant Howard's sexual misconduct to their well-being.  *See doc.*

*340.*  Through this nonparty testimony, the jury members heard detailed accounts of

Defendant Howard's misconduct toward nonparties, repetitive accounts of Defendant

Howard's misconduct toward Plaintiff, and emotional accounts of Defendant Howard's

harm to nonparties.  Indeed, many of the witnesses became visibly emotional on the

stand.  The Court provided instructions to the jury regarding how they should calculate

compensatory damages as well as limiting instructions regarding the purpose of the

testimony about harm to nonparties.  *See doc. 354* at 18-22 (jury instruction on

compensatory damages); *doc. 354* at 24 (limiting jury instruction regarding evidence of

Defendant Howard's conduct with other female students).  However, while there is an

assumption that juries follow their instructions, courts and commentators recognize

that the assumption cannot always be relied upon.  *See* Fed. R. Evid. 403, Advisory

Committee Notes (a determination on unfair prejudice should include consideration of

the possible effectiveness or lack of effectiveness of a limiting instruction); *see*

*generally Bruton v. United States*, 391 U.S. 123, 135 (1968) (limiting instruction could not

cure problems presented by defendant's inability to cross-examine declarant when co-

defendant's confession is admitted); *see also* David A. Sklansky, *Evidentiary Instructions*

*and the Jury as Other*, 65 Stan. L. Rev. 407, 425-29 (2013) (meta-analysis showing a wide

variance in the effectiveness of jury instructions on mock jurors).  While the Court

concluded that the admission of this evidence was proper, the resulting verdict

indicates a strong risk that the jury did not follow the applicable limiting instructions and that the repetitive and emotional nature of the evidence inflamed the jury's passions leading to an excessive award.

Second, Plaintiff introduced four pieces of prejudicial and inadmissible evidence that would tend to influence a jury to act with passion or prejudice in deciding damages.  One, Plaintiff called Lane Hauser, the father of one of the nonparty former students who had been inappropriately touched by Defendant Howard.  Mr. Hauser, whose relevant testimony was extremely limited, provided intensely emotional testimony about his daughter's birth and about his opinion of Defendant Howard's skill as a teacher and FFA instructor which, had counsel for defense objected, the Court would have excluded as irrelevant and unduly prejudicial.  In addition, Plaintiff's counsel asked Mr. Hauser to describe the immediate impact of Defendant Howard's conduct on his daughter, a nonparty, a question which went beyond the scope of the Court's order, *see doc. 340*, and which the Court prevented Mr. Hauser from answering. Two, during the testimony of C.H., one of the nonparty former students touched by Defendant Howard, C.H. recounted two dreams that she had, the first in which someone was holding her head under water, and she knew it was Defendant Howard, and the second in which she left a court session and as she was getting into her car, three people started stabbing her.  The Court instructed the jury to disregard the latter dream because it did not involve Defendant Howard and appeared to be beyond the

scope of the Court's order.  *Doc. 340*.  However, as noted, jury members may not always follow limiting instructions.  Three, during the testimony of Dr. Newring, Plaintiff's expert, Dr. Newring expressed an opinion that Defendant Howard may have been using his memories of touching female students in order to masturbate, a wild speculation which was nowhere in his expert report and not supported by any evidence.  The Court again instructed the jury to disregard that comment.  Four, at the conclusion of Plaintiff's testimony, Plaintiff's counsel asked Plaintiff if she had a statement she would like to read to the jury.  This question was improper as it gave no opportunity to the defense to understand what information the question called for.  The question required an objection from Defendant which was sustained by the Court. Unavoidably, this instance reinforced the strong plaintiff narrative that Plaintiff had been silenced by Defendant and the court system (discussed in more detail in the following paragraph).

Third, the jury may have been prejudiced or impassioned by Plaintiff's counsel's strong focus on making Defendant Howard seem wholly responsible for harms caused to Plaintiff primarily by third parties with limited evidence that Defendant Howard caused or contributed to those harms.  Throughout opening and closing arguments as well as the presentation of evidence, Plaintiff's counsel repeatedly invoked the idea that much of Plaintiff's harm was caused by Defendant Howard's unwillingness to admit publicly that he had engaged in sexual misconduct with Plaintiff and other female

14

students.  For example, counsel argued that if Defendant Howard had publicly

admitted to his misconduct immediately after he was removed from his teaching

position, other students may not have bullied Plaintiff.  Counsel also argued that

Defendant Howard's unwillingness to make a public admission prolonged and delayed

his criminal proceedings which harmed Plaintiff.  Although Defendant Howard's

conduct was certainly a but-for cause of any harms Plaintiff experienced from the

bullying and the criminal proceedings, there was no evidence that Defendant Howard

was responsible for perpetuating the bullying and limited evidence that he was

responsible for prolonging the criminal proceedings.  In fact, there was evidence that

Defendant Howard followed instructions not to speak to his former students after he

was removed from his position, and that he acted on the advice of his criminal counsel

throughout the criminal proceedings.  Plaintiff's counsel also invoked Defendant

Howard's responsibility when she started both her opening and closing arguments with

the statement that Plaintiff had endured "seven years of not being believed" between

the time of Defendant Howard's sexual misconduct in 2017 and the jury trial before this

Court in 2024.  This statement was highly misleading and arguably false, given that

school officials immediately removed Defendant Howard from his position in 2017 after

they learned of his misconduct, and there was evidence that many members of

Plaintiff's community, including her family, close friends, and law enforcement,

immediately believed her account of Defendant Howard's misconduct.  At the very

least, Plaintiff cannot credibly argue that Defendant Howard's responsibility for anyone's disbelief extended past his guilty plea to sexually touching Plaintiff in his criminal proceedings in May, 2021.[7]  There is a strong risk that Plaintiff's repeated and impassioned invocations that Defendant Howard was wholly responsible for all of the harms that ensued after his misconduct was exposed caused the jury to give an excessive award.

Finally, the $11 million compensatory award is excessive because it is substantially outside the universe of damages awarded in truly comparable cases. When assessing whether the evidence of the case supports the damages award, the Tenth Circuit has discouraged district courts from comparing the award to those of other cases.  *Osterhout*, 10 F.4th at 999 ("In general, comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations and detract from the appropriate inquiry, which is whether the verdict is against the weight

---

[7] Plaintiff's conflation of facts regarding Plaintiff's harm from not being believed can be seen throughout her response to the instant Motion.  For example, she states that "[u]ntil they testified in trial, these girls (now young women) were not believed, and they were repeatedly shamed by being told that being groped and grabbed over their clothes by a 54-year-old teacher in a position of authority and trust was not a big deal, not a rape, not skin-on-skin touching. They were told to move on because their experiences would not be understood let alone valued by a jury."  *Doc. 383* at 6.  Aside from the fact that Plaintiff's references to multiple young women throughout her response is unavailing as to compensatory damages given that only one individual's claims were at issue in this trial, it is unclear who, if anyone, "repeatedly shamed" Plaintiff about providing an account of her experience or told her that her experiences would not be "valued by a jury."  Certainly, there was no evidence that Defendant did so.  In another example, Plaintiff states that she was "[s]ilenced by the criminal justice system that had made her promise not to talk to her family or fellow female students about the sexual assaults."  *Id.* at 24.  Plaintiff's approach here, as it did at trial, muddles any distinctions between harm caused by Defendant Howard's actions and harm caused by processes, such as criminal justice procedures and protections, outside of Defendant Howard's control.

of the evidence.") (citation and quotation omitted).  However, the Tenth Circuit has

"made exceptions where a previous case is similar enough to serve as a meaningful

benchmark."  *Hill*, 815 F.3d at 671.

In briefing, Defendant provides the Court with several cases involving teacher

sexual misconduct with students.  All of these cases, with the exception of *Mirlis* which

involved substantially more severe and prolonged sexual misconduct than the instant

case, resulted in significantly lower compensatory damages.  *See Sanchez v. Brokop*, 398

F.Supp.2d 1177, 1190 (D.N.M. 2005) (upholding a jury award of $1.2 million in

compensatory damages against the defendant who touched the six-year-old plaintiff

through her clothing in her genital area while he was serving as a substitute teacher);

*Nicholson v. Delgadillo*, No. 1:12-CV-00470-EJL-CWD, 2014 WL 6895566, at *6 (D. Idaho

Dec. 5, 2014) (awarding $225,000 in compensatory damages after a default judgment

against a school resource officer who groomed the plaintiff and "sexually molested and

raped" him on "dozens of occasions" over a period of months); *Mirlis v. Greer*, 952 F.3d

36, 49-50 (2d Cir. 2020) (upholding the lower court's denial of remittitur of a $15 million

compensatory damage jury verdict against a rabbi who supplied an underage student

with alcohol, watched pornography with the student, and "engaged in kissing, oral and

anal sex, and mutual masturbation" with the student at several locations, often for

"hours at time"; the defendant sexually assaulted the student on a weekly basis for the

first year and at least once a month for the following two years); *G.G. v. Grindle*, 665

F.3d 795, 799-800 (7th Cir. 2011) (upholding the lower court's denial of remittitur of a $250,000 compensatory damage jury verdict against a school principal who failed to stop a music teacher from inappropriately touching the fifth-grade plaintiff over the clothes on her breast and the middle of her thigh); *Doe v. Sch. Bd. of Miami-Dade Cnty.*, 624 F.Supp.3d 1292, 1302-03 (S.D. Fla. 2022) (denying remittitur of a jury's award of $3 million in past damages and $3 million in future damages against a school district that failed to stop a teacher from grooming and repeatedly engaging in kissing, groping, oral sex, and sexual intercourse with an underage student); *Doe v. Mann*, No. 6:05-cv-259-Orl-31DAB, 2007 WL 2028833, at *6-7 (M.D. Fla. July 10, 2007) (granting $1.106 million in compensatory damages after a default judgment against a police officer defendant who repeatedly engaged in sexual intercourse with a 14-year-old).

Plaintiff argues that most of Defendant's cases are out-of-date and do not account for the cultural shift that occurred as part of the #MeToo movement. *Doc. 383* at 32. In her response, Plaintiff suggests that the Court look at a variety of other, more recent cases involving sexual misconduct. She first points to the settlements with various defendants in the cases involving Larry Nassar and James Heaps. *Id.* at 35. However, even if settlements were an appropriate comparison for the jury award in this case, the settlement amounts given to individual plaintiffs in the Nassar and Heaps cases appear

to be far lower than the compensatory damages awarded to Plaintiff in this case.[8]  In

addition, both Larry Nassar and James Heaps were accused of more severe sexual

misconduct with at least some of their victims than Defendant Howard was accused of

with Plaintiff.  Next, Plaintiff cites to the jury verdict in the defamation case brought by

E. Jean Carroll against Donald Trump in which the court upheld an $18.3 million

verdict in compensatory damages.  *Id.*  Plaintiff argues that this case is an apt

comparison to the facts of the instant case because both E. Jean Carroll and Plaintiff

suffered from "reputation destruction" as a result of the sexual misconduct of the

defendant.  *Id.*  However, the $18.3 million damage award in *Carroll* was given for a

defamation claim which is not comparable to the constitutional claim in the instant

case.[9]  In addition, the facts of *Carroll* are vastly different in that Mr. Trump engaged in

"malicious and unceasing attacks on Ms. Carroll" which were "disseminated to more

---

[8] Plaintiff states that the settlements in cases related to Larry Nassar's conduct have totaled $1.018 billion. *Doc. 383* at 35.  It is unclear from Plaintiff's briefing how many plaintiffs were involved in the settlement negotiations, although Plaintiff notes that the Federal Bureau of Investigation recently settled 139 tort claims with Nassar victims.  *Id.*  Even assuming there were only 139 victims (a low estimate), and each victim received an equal portion of the $1.018 billion settlement, each plaintiff would still only receive approximately $7.3 million, $3.7 million less than Plaintiff received in compensatory damages here.  The Court also notes that the Nassar settlements were reached with multiple defendants, as opposed to the single defendant in the instant case.  With respect to the James Heaps settlements, Plaintiff states that 312 victims reached a $700 million settlement, or approximately $2.2 million per victim.  *Id.*

[9] Notably, in a separate lawsuit, Ms. Carroll sued Mr. Trump on a sexual battery claim for an incident in which Mr. Trump forcibly held Ms. Carroll down in a dressing room and inserted his fingers into her vagina.  *Carroll v. Trump*, 683 F.Supp.3d 302, 307 (S.D.N.Y. 2023).  After the jury awarded $2 million in compensatory damages for the sexual battery claim, counsel for Mr. Trump argued that the jury's award "could have been based upon no more than groping of [Ms. Carroll's] breasts through clothing or similar conduct."  *Id.* (citations and quotations omitted).  The court agreed that "a $2 million award for such groping alone could well be regarded as excessive," but that the jury had "implicitly found" that Mr. Trump engaged in much more severe conduct which justified the $2 million award.  *Id.*

than 100 million people," "included public threats and personal attacks," and
"endangered Ms. Carroll's health and safety." *Carroll v. Trump*, 20-cv-7311 (LAK), 2024
WL 1786366, at *5 (S.D.N.Y. Apr. 25, 2024). Although Defendant Howard may not have
publicly admitted his guilt until May 2021 at his criminal plea hearing, he also never
affirmatively denied his guilt, and he certainly did not publicly attack Plaintiff. Lastly,
Plaintiff cites to a New Mexico state court case in which an underage plaintiff was
awarded $80 million in compensatory damages against four defendants after she was
repeatedly raped in her foster care home by her foster father. *Doc. 383* at 35 (citing
*Inman v. Garcia*, D-117-CV-2019-00136 (1st Jud. Ct. N.M. 2019)). This case, however,
involved significantly more severe conduct than the instant case, and it also ultimately
settled out of court for an unknown amount.

Plaintiff also argues in briefing and during oral argument that Defendant
Howard's case examples are not useful because those cases did not involve an
equivalent level of long-term abuse and emotional harm by a trusted member of the
plaintiff's community, a plaintiff with vaginismus, or the loss of reputation for the
plaintiff. *Id.* at 33; *doc. 405*. However, many of Defendant's cases do involve one or
more of these elements. *See, e.g., Sanchez*, 398 F.Supp.2d at 1190 (plaintiff "would suffer
the effects of the molestation for a significant period, possibly for the rest of her life");
*Nicholson*, 2014 WL 6895566, at *1 (plaintiff was "diagnosed with PTSD, anxiety,
depression, and reports difficulty focusing, nervousness, feelings of unease, and

avoidance of intimate partner relationships"); *Mirlis*, 952 F.3d at 49 (plaintiff

experiences "issues with intimacy" and the sexual abuse he experienced will have

"lifelong consequences for him"); *see also Vargas v. Oh*, CIVIL NO. 19-00116 LEK-WRP,

2024 WL 946510, at *2 (D. Haw. Feb. 1, 2024) (awarding $750,000 in general damages

after a default judgment against a defendant police officer who sexually assaulted the

plaintiff while responding to a 911 call, causing the plaintiff to suffer from PTSD,

depression, severe anxiety, and "institutional betrayal" by the police department); *S.C.*

*v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 579 F.Supp.3d 999, 1002 (M.D. Tenn.

2022) (awarding $75,000 after a bench trial against a school district that failed to react

appropriately when a video of a student engaging in sexual activities was disseminated

around a school and the student faced "both humiliation related to the video and

threats from other students related to her cooperation" in the investigation of the

incident).  In addition, Plaintiff is unable to provide any examples of cases which have

similar facts and similarly high compensatory damage awards. [10]  The Court does not

necessarily disagree with Plaintiff that the aforementioned cases have significant factual

---

[10] In addition to the cases discussed in the previous paragraph of this Order, Plaintiff lists a variety of cases with large compensatory damage verdicts, but none of these cases involve sexual misconduct.  *Doc. 383* at 34 (citing *Gilliam v. Allen*, 62 F.4th 829, 834 (4th Cir. 2023) (wrongful conviction which led to 31 years of wrongful imprisonment of plaintiff); *Estate of Moreland v. Dieter*, 395 F.3d 747, 751-53 (7th Cir. 2005) (prison guards violently assaulted an inmate which led to his death); *Jimenez v. City of Chicago*, 732 F.3d 710, 713 (7th Cir. 2013) (wrongful conviction which led to 16 years of wrongful imprisonment); *Fields v. City of Chicago*, 981 F.3d 534, 541-42 (7th Cir. 2020) (wrongful conviction which led to 12 years of wrongful imprisonment); *Blasingame v. Grubbs*, CIVIL ACTION FILE No. 1:19-CV-2047-SCJ, 2022 WL 4363631, at *2-4 (N.D. Ga. Sept. 14, 2022) (police chase which led to severe physical injuries for plaintiff)).

differences from the instant case and are thus not "similar enough to serve as a meaningful benchmark." *Hill*, 815 F.3d at 671.  However, the purpose of the Court's review of other cases is not to help the Court identify the precise amount of compensatory damages that Plaintiff should be awarded.  Instead, the purpose of the review is to show that, even among cases with significantly more severe misconduct, most compensatory damage awards in cases with teacher-student sexual misconduct do not compare with that awarded by the jury in the instant case.  Consequently, this review supports the Court's conclusion that the $11 million compensatory verdict is clearly excessive.

Given the emotional distress suffered by Plaintiff, there is no doubt that Plaintiff is entitled to a substantial award.  However, the evidence simply does not support an award of this degree.  After carefully considering the "maximum amount of damages that are reasonably supported by the evidence in the record," the Court will remit Plaintiff's compensatory award to $3.25 million.[11]  *See Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1080 (10th Cir. 2008) (citing *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1161-62 (10th Cir. 1985)).

---

[11] This amount represents a payment, not reduced for any present value discount, of $50,000 a year for Plaintiff for every year from age 15 to age 80 which this Court concludes is the maximum amount of damages that are reasonably supported by the evidence in the record.

B.      Punitive Damage Award

Punitive damages which impose "grossly excessive or arbitrary punishments on a tortfeasor" violate a defendant's due process rights under the Fourteenth Amendment. *Burke*, 935 F.3d at 1037.  As a result, "[d]ue process requires federal courts to perform an exacting de novo review of the constitutionality of punitive damage awards to ensure that an award of punitive damages is based upon an application of law, rather than a decisionmaker's caprice." *Lompe*, 818 F.3d at 1061 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).  When determining whether the punitive damage award was constitutional, a federal court must consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 575 (1996).  Based on its assessment of the three guideposts in the context of this case, the Court determines that the jury's award of $33 million in punitive damages violates Defendant Howard's constitutional due process rights.

The Court first considers the degree of reprehensibility of Defendant Howard's actions given that reprehensibility is "[t]he most important indicium of the reasonableness of a punitive damages award." *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 575).  When determining reprehensibility, courts are instructed to consider

five factors: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.*

For the most part, the five reprehensibility factors weigh in favor of Plaintiff. Defendant Howard's harm to Plaintiff was physical and emotional, not financial. His grooming and inappropriate touching of both Plaintiff and other female students suggest that he acted with reckless disregard to the health and safety of Plaintiff and other students. Although Plaintiff was not necessarily financially vulnerable, she was in a subordinate and vulnerable position compared to Defendant Howard due to both her age and her status as Defendant Howard's student. Defendant Howard's misconduct was repeated - he groomed Plaintiff over several years, and inappropriately touched her in multiple areas of her body on multiple occasions. Finally, Defendant Howard's conduct was not accidental, and he knew he was engaging in wrongful

behavior.  Given the presence of these factors, the Court is satisfied that Plaintiff is entitled to significant punitive damages.

However, the presence of all of the reprehensibility factors in Plaintiff's favor cannot mean that any punitive damages award, no matter the size, will be constitutional.  The purpose of the reprehensibility analysis is to determine the "gravity of the defendant's conduct," a process which "reflects the accepted view that some wrongs are more blameworthy than others."  *Gore*, 517 U.S. at 575 (citation and quotation omitted).  Punitive damages "may not be grossly out of proportion to the severity of the offense."  *Id.* at 576 (citation and quotation omitted).  Although sexual misconduct of any type is wrong, some acts of sexual misconduct are certainly more reprehensible than others.  As noted above, Defendant Howard engaged in reprehensible behaviors by knowingly taking advantage of his position of power to groom and repeatedly sexually touch an underage student over the course of two years. However, there is no evidence that Defendant Howard undertook more severe sexual misconduct such as violence that resulted in physical injury, touching Plaintiff underneath her clothes, or engaging in, asking to engage in, or forcing Plaintiff to engage in sexual acts.  In addition, his acts of misconduct, such as hugging Plaintiff, touching her buttocks, or placing his hand on her thigh, were relatively limited in duration.  That is, he did not subject Plaintiff to sexual touching for hours at a time.  On

balance, the reprehensibility of Defendant Howard's actions does not justify the $33 million award.

For the second guidepost, or the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, courts examine the ratio between the compensatory and punitive damages.  It is well established that punitive damages "must bear a reasonable relationship to compensatory damages."  *Gore*, 517 U.S. at 580 (citations and quotations omitted)[12].  Although there is no "bright-line ratio which a punitive damages award cannot exceed[,] . . . in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *State Farm*, 538 U.S. at 425.  Indeed, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  *Id.*  That said, the Supreme Court has upheld punitive awards that exceed a 1:1 ratio with compensatory damages.  *Id.* (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991) in which the court upheld a punitive damage award that was more than four times the compensatory award).

In the instant case, the jury's award of a three times ratio between the punitive and compensatory damages, even accounting for the Court's remitted compensatory

---

[12] The jury was also explicitly instructed that punitive damages "must be reasonably related to the injury and to any damages given as compensation, and not disproportionate to the circumstances."  *Doc. 354* at 24 (Jury Instruction 13 – Punitive Damages).

award, is excessive.  The remitted compensatory award of $3.25 million is still a "substantial" award for the conduct involved in this case, which supports the finding that a lesser ratio between punitive and compensatory and damages is warranted.  *See id.*  In addition, in cases like this where the harm is primarily emotional distress, "the compensatory damages . . . likely were based on a component which was duplicated in the punitive award."  *Id.* at 426.  The fact that the jury likely compensated Plaintiff for her emotional distress and reputational loss as well as punished Defendant for these same harms supports the finding that no more than a 1:1 ratio of compensatory to punitive damages is constitutionally permitted.  Lastly, the Court notes that the jury's punitive damages award matches Plaintiff's counsel's request during closing argument that the jury award three times punitive damages.  Specifically, Plaintiff's counsel stated that when determining punitive damages: "It is usually a multiplier of one time compensatory, six times compensatory or more.  What we ask is three times, $33 million."  *Doc. 400* at 74:25-75:3.  First, Plaintiff provided no evidence-based justification for why a three times multiplier was reasonable.  Second, Plaintiff's implication to the jury that punitive damages are "usually" calculated by juries using multipliers (let alone 3 or 6 times multipliers) did not have any basis in law.  Although courts use the ratio/multiplier analysis as one factor to determine *post hoc* whether the jury's punitive damage award was constitutional, the ratio/multiplier is not a means for juries to compute punitive awards in the first place.  Punitive damages should be based on the

determination of the amount necessary to punish the defendant and not a mathematical

formula to be applied in every case.  In fact, juries frequently find that a smaller amount

of punitive damages than compensatory damages is sufficient to punish the defendant.

Based on the foregoing reasons, the Court finds that three times multiplier for punitive

damages was unconstitutionally high in the context of this case.

For the third *Gore* guidepost, courts evaluate the disparity between the punitive

damages award and awards imposed in comparable cases in order to determine

"whether Defendant had reasonable notice that [his] conduct could result in such a

large punitive award."  *Lompe*, 818 F.3d at 1070 (quoting *Cont'l Trend Res., Inc. v. OXY

USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996)).  As with compensatory damages, *see supra*

at 16-22, the Court is unable to find strong precedent for a punitive damage award of

the size awarded by the jury in this case, and it concludes that Defendant Howard could

not have been put on notice that his conduct could result in a $33 million verdict for

punitive damages.  *See Sanchez,* 398 F.Supp.2d at 1190 (jury awarded $2 million in

punitive damages against a substitute teacher who touched a young student's genital

area over her clothes); *Nicholson*, 2014 WL 6895566, at *6 (court awarded $675,000 in

punitive damages against a school resource officer who groomed and repeatedly raped

an underage student); *Mirlis*, 952 F.3d at 49-50 (jury awarded $5 million in punitive

damages against a rabbi and school leader who groomed and repeatedly sexually

assaulted a student over the course of three years); *Grindle*, 665 F.3d at 799-900 (jury

awarded $7,250 in punitive damages against a school principal who failed to stop a

music teacher from inappropriately touching a student on her breast and thigh); *Vargas*,

2024 WL 946510, at *2 (court awarded $250,000 in punitive damages against a police

officer who raped a woman while on duty).  Notably, in *Mirlis*, which involved much

more severe and pervasive sexual misconduct than the instant case, the jury awarded

$15 million in compensatory damages, but it only awarded $5 million in punitive

damages.  952 F.3d at 50.  This result supports the conclusion that punitive and

compensatory damages may be duplicative in cases with primarily emotional distress

damages and that, in the face of a substantial compensatory award, an even larger

punitive damages award is unlikely to be constitutional.

 Plaintiff's case examples also would not have put Defendant Howard on notice

that his conduct could result in a $33 million punitive damage award.  As discussed in

greater detail above, many of Plaintiff's cases involved wrongful imprisonment,

excessive police force, and prison abuse claims, factual circumstances which are not

comparable to those of the instant case.  *Doc. 383* at 34.  Two of Plaintiff's examples

were the Larry Nassar and James Heaps settlements which did not involve a punitive

damage award and, in any case, resulted in significantly lower total awards to each

claimant than Plaintiff received here.  *Id.* at 35.  Plaintiff's example of E. Jean Carroll's

defamation lawsuit against Donald Trump resulted in $65 million in punitive damages,

but it involved markedly different and much more extreme facts than the instant case.

*See supra* at 19-20.  Plaintiff's final case example is *Shasta*, in which a New Mexico state

court jury awarded a foster child who was repeatedly raped by her foster parent $405

million in punitive damages.  D-117-CV-2019-00136 (1st Jud. Ct., N.M. 2019).  Although

the total punitive damage award in that case was high, only $5 million of the award was

against the foster parent who actually perpetrated the sexual assaults, and the parties

ultimately settled out of court for an unknown amount.  *See doc. 392-1* at 3.  Overall, the

Court is unable to find an example of a damage verdict in a comparable case that would

provide any precedent for the $33 million verdict awarded against Defendant Howard.

The foregoing analysis under the three *Gore* guideposts supports the conclusion

that $33 million is an unconstitutionally excessive punishment for Defendant Howard's

misconduct.  In addition, the Court finds that the jury's punitive damages award is

unconstitutionally excessive in light of the purpose of punitive damage awards.  Unlike

compensatory damages which "are intended to redress the concrete loss that the

plaintiff has suffered by reason of the defendant's wrongful conduct[,] . . . punitive

damages serve a broader function" of "deterrence and retribution."  *State Farm*, 538 U.S.

at 416; *see also Lompe*, 818 F.3d at 1065 ("In our review of the constitutionality of the

punitive damages award against [the defendant] . . . we must primarily decide 'whether

the particular award is greater than reasonably necessary to punish and deter.'")

(quoting *Haslip*, 499 U.S. at 22).  Indeed, the jury in this case was instructed that

"[p]unitive damages are awarded for the limited purposes of punishment and to deter

others from the commission of similar offenses." *Doc. 354* at 23-24 (Jury Instruction 13 –

Punitive Damages).  The jury was also instructed to consider "the likelihood that

Defendant would repeat the conduct" when determining punitive damages.  *Id.* at 24.

Like most other aspects of damage awards, there is no clear formula for

determining whether a punitive damage award is sufficient to punish a defendant and

to deter future similar misconduct by the defendant and others.  However, the Tenth

Circuit has found that "the wealth and size of the defendant are relevant

considerations."  *Deters v. Equifax Credit Info Svs., Inc.*, 202 F.3d 1262, 1273 (10th Cir.

2000); *see also Cont'l Trend Res., Inc.*, 101 F.3d at 641 ("Yet wealth must remain relevant,

because $50,000 may be awesome punishment for an impecunious individual defendant

but wholly insufficient to influence the behavior of a prosperous corporation.").

Defendant Howard is an individual defendant who spent his career earning a teacher's

salary.  $33 million is far more money than is necessary to punish him and to deter him

(or any other teacher) from engaging in this kind of sexual misconduct again.  Further,

because there is no evidence that Defendant Howard will ever return to teaching, he is

much less likely to be in a position where he could engage in sexual misconduct with

students, and thus a reduced punitive damage award is sufficient to deter him from this

behavior.[13]  Finally, it should be noted that, outside of extremely unlikely circumstances,

---

[13] Plaintiff's counsel presented evidence that Defendant Howard's teaching license was never revoked by the state.  However, his license has since expired, and there is no evidence that he has taken any steps to renew it.

Defendant Howard will not pay the punitive damages award because he was insured. *See doc. 286*. As a result, the jury's award will not serve the purposes of punishment and deterrence, but instead will impose massive costs on the insurer, and ultimately other insured parties who have no stake in this case.

Based on the foregoing analysis, the Court concludes that the $33 million punitive damage award is unconstitutionally excessive, and it will accordingly reduce the award to $3.25 million.

## III.   REMITTITUR PROCEDURE

Because compensatory damages are a question of fact and the "Seventh Amendment constrains the trial court to defer to the fact-finding function of the jury," a trial court may not unilaterally reduce a compensatory damage award given by a jury. *Lompe*, 818 F.3d at 1061 (citing *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 n.11 (2001)). Thus, the Court must and will offer Plaintiff a choice between accepting a remitted compensatory damage award or a new trial on damages. *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1447-48 (10th Cir. 1987).

However, the Court need not offer Plaintiff the same choice with respect to the reduced punitive damages award. Unlike compensatory damages, punitive damages are "not really a 'fact' 'tried' by the jury," *Lompe*, 818 F.3d at 1062 (citing *Cooper Indus.*, 532 U.S. at 437), and district courts may not apply a deferential standard in their review of the jury's determination of punitive damages, *id.* ("In ruling on Defendants'

constitutional challenge [to the amount of punitive damages] in this case, the district court improperly applied a deferential standard of review, explaining that it 'hesitates to interfere with the jury's determination as to the amount of punitive damages' because 'it is not the Court's province to second-guess the jury's findings.'") (quoting *Lompe v. Sunridge Partners, LLC*, 54 F.Supp.3d 1252, 1271 (D. Wyo. 2014)).  Instead, as noted above, district courts must "perform an 'exacting' de novo review of the constitutionality of punitive damages awards," *id.* at 1061, in order to determine "the maximum constitutionally allowable award under these particular facts," *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1208 (10th Cir. 2012).  If the Court determines that the award is unconstitutional, it may reduce the award without providing the plaintiff a choice between a new jury trial or acceptance of the remittitur.[14]  *See Lompe*, 818 F.3d at 1062 (reducing the punitive damage award against a defendant without offering the plaintiff the choice of a new trial); *Jones*, 674 F.3d at 1208 n.8 (same); *see also Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1332 n.19 (11th Cir. 1999) (noting the impracticality of offering a plaintiff a choice between accepting the constitutional maximum for punitive damages and a new trial: if the plaintiff were awarded more than the constitutional maximum at the new trial, the court would still be required to

---

[14] In addition, during oral argument on the instant Motion, counsel for both parties agreed that the Court must only provide the plaintiff the option of a new trial with respect to the remitted compensatory damages award; the Court need not provide the plaintiff a choice between accepting a punitive damage award or a new trial.  *See doc. 405.*

33

reduce the award, but if the plaintiff were offered less than the constitutional maximum at a new trial, the plaintiff would be at a comparative loss).

As a result, even if Plaintiff declines the Court's remitted compensatory award and opts for a second trial in this matter, the jury at the second trial will only decide compensatory damages.  The Court's remittitur of the punitive damages award will become appealable after the Court enters its amended final judgment in this matter.  In the event that this case proceeds to a second trial and the second jury returns a compensatory award less than $3.25 million, the Court may reevaluate the constitutionality of a $3.25 million punitive damage award.

## IV.  CONCLUSION

Based on the foregoing reasoning, Defendant's Motion for Remittitur is GRANTED.  The jury's award of $11 million in compensatory damages is remitted to $3.25 million, and the award of $33 million in punitive damages is reduced to $3.25 million.  Plaintiff has through **June 13, 2024,** to file a notice on the docket stating whether she will accept the remitted compensatory damages award or proceed with a new trial on compensatory damages only.

Defendant's Motion for New Trial is HELD IN ABEYANCE until after Plaintiff makes her decision regarding whether she will accept the Court's remitted compensatory award or proceed to a second trial.  If Plaintiff accepts the remitted compensatory award, Defendant Howard will have **seven (7) days** from the date of

Plaintiff's acceptance to file a notice with the Court indicating whether (1) he is still requesting a ruling on the merits of the Motion for New Trial, or (2) he is withdrawing the Motion for New Trial.  If Plaintiff does not accept the remitted compensatory award, and the case proceeds to a second trial, Defendant's Motion for New Trial will be mooted.

      IT IS SO ORDERED.

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**